UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

KING DAVID LEVON DONAHUE III,

          Plaintiff,

    v.

ANTIOCH POLICE DEPARTMENT; COUNTY OF CONTRA COSTA; CITY OF ANTIOCH; OFFICERS JOSHUA RIOSBAAS, KYLE SMITH, SHAWN MARQUES, JACOB KING, RYAN GEIS, RUDOLPH NIEVES, ARTURO BECERRA, MATTHEW KOCH, BRANDON BUSHBY, and JOSHUA EVANS; and PROSECUTOR HEATHER P. TURNER,

          Defendants.

No. C 23-05564 WHA

**ORDER RE SUMMARY JUDGMENT**

**INTRODUCTION**

In this Section 1983 action, plaintiff seeks relief for being stopped roadside, ordered to exit his vehicle by officers with d firearms drawn, handcuffed tightly, dispossessed of his phone, subjected to the search and impoundment of his car, jailed for nearly five full days, and prosecuted on charges soon dropped. Plaintiff moves for summary judgment. Defendants — a city and its active police officers, a county and a prosecutor, and a former police officer — do the same, in three separate motions. For reasons below, summary judgment is granted in part for defendants, and denied in part for defendants. Some issues must be tried.

United States District Court
Northern District of California

# STATEMENT

## 1.    FACTUAL ALLEGATIONS.

This order sets out the undisputed facts, the remaining disputes, and — given defendants invoke qualified immunity — also notes constructions that favor plaintiff.  To get oriented:

| Date | Time | Events |
|---|---|---|
| Jan. 6, 2023 | 5:42 p.m. | Officer Riosbaas's police lights turned on, on Lone Tree Way. |
| | 5:43 | Donahue's car stopped moving, on Deerspring Way. |
| | 5:43 | Backup called. |
| | 5:54 | Having arrived, backup drew guns; Donahue ordered to exit his car. |
| | 5:54 | Donahue handcuffed and placed in back of police SUV. |
| | 6:01 | Donahue's complaints about handcuffs first heard by officer. |
| | 5:54–5:55 | Donahue's iPhone taken from him. |
| | 6:20 | Officers find gun in Donahue's car; car later towed, impounded. |
| | 6:38–6:40 | Donahue re-cuffed, moved to transport vehicle, later to jail. |
| Jan. 7 | 2:18 a.m. | Contested probable cause determination by judge (Saturday). |
| Jan. 11 | 1:35 p.m. | Arraignment by judge (Wednesday). |

### A.    THE SIGHTING AND PURSUIT.

On January 6, 2023, after dark at about 5:40 p.m., pro se plaintiff King David Levon Donahue III was driving a blue 2019 Kia Stinger with tinted windows east on Lone Tree Way, a three-lane road in Antioch, California.  At the same time, Officer Joshua Riosbaas of the Antioch Police Department was driving the same way on the same road in a marked police SUV, with a trainee cadet as passenger.  (Plaintiff did not bring claims against the cadet; no declaration by the cadet is in evidence.)  All agree the road had a 45 mile per hour speed limit.

Parties dispute what happened next, and why Officer Riosbaas stopped Donahue.

*According to Officer Riosbaas* (¶¶ 4–11, 50)[1]:  "At 5:42 p.m., I saw [the Kia] speed past me in the far-left lane, going approximately 75 mph."  (His police report appeared to state the Kia passed him on the opposite side.)  The Kia "was weaving through traffic at a dangerous speed without signaling," such that other cars had to take measures to avoid collision.  Officer Riosbaas then twice "paced" the Kia, keeping "a constant distance to estimate its speed,"

---

[1]  Where the declarant is self-evident, citations to paragraphs are to the corresponding declaration. Those for all officers are found within the City of Antioch's exhibits (Dkt. No. 146), except for former officer Joshua Evans (Dkt. No. 148-2).

United States District Court
Northern District of California

traveling at least 200 feet behind.  *First*, he paced the Kia "at around 75 mph between Deer Valley Road and Sagebrush Drive" (for an unknown length of time).  The cross street Deer Valley comes first, then Sagebrush, then Hillcrest.  *Second*, he paced the Kia "between Sagebrush Drive and [Hillcrest Drive], this time at about 66 mph for roughly five seconds." (At the scene itself, Officer Riosbaas told another officer only that the Kia "was going 65 miles — er, 70, down Hillcrest"; when asked "Seventy?," he said, "Yeah I's, I's— that's what I had to do to keep up with him.  I was traveling 70" (Riosbaas 17:56:00).)  Officer Riosbaas attested he turned on his dash camera only before the second pacing.

*According to Donahue*, the cars came in sight of each other only during what Officer Riosbaas characterized as the videoed "second pacing."  And, during that "pacing" Officer Riosbaas sped up to reach Donahue but only observed him traveling under the 45 mile-per-hour limit while signaling lane changes — as Donahue had been doing all along (Donahue Br. 8; Dep. Tr. Vol. II 68–69; Feb. 27, 2025 Dep. Tr. 18–19).

*Construed to favor Donahue*, and limited by the video evidence, a reasonable jury could find the following (stated here for comparison to the above):  At 5:41 p.m., Officer Riosbaas turned on his dash camera before seeing a Kia.[2]  He changed lanes around traffic and drove for about ten seconds on Lone Tree Way towards the distant taillights of a car — the Kia.  With his dashboard-recorded speed between 63 and 66 miles per hour, Officer Riosbaas closed the distance.  Then, the Kia's brake lights went on.  They stayed on for more than five seconds (Dash-Only 17:41:10–20).  While the Kia was braking, the police SUV's dashboard-recorded speed slowed to 50 miles per hour, closing even more distance.  The Kia's brake lights turned off.  And, the Kia then changed from the center into the left lane without a blinker (17:41:21). The police SUV slowed the rest of the way to 45 miles per hour, closing the remaining distance (17:41:20–25).  The two then drove at or under the speed limit.  Finally, the Kia changed back into the center lane with a blinker, but in an intersection (17:41:42).  The siren went on.

---

[2]   Except where specified, all further citations to camera footage are to the time-synced composite of Officer Riosbaas's dash-mounted camera with other body-worn camera footage (and audio), which a contractor prepared for the City of Antioch (Dkt. No. 146-4, Robinson Decl. Exh. B). Raw feeds are cited where they provide video or audio the composite did not.

So, in sum, as the police SUV's dash-recorded speed hit 66 miles per hour to reach the Kia, the Kia's brake lights came on and stayed on for more than five seconds, after which the Kia changed lanes without signaling, as no reasonable jury could conclude otherwise.

### B.    THE INITIAL STOP.

#### (i)    Pulling Over.

Just before 5:42 p.m., Officer Riosbaas turned on his red-and-blue lights and yipped his siren. The Kia hit its breaks again, began to signal, and shifted to the far-right lane. Lights flashing but sirens off, Officer Riosbaas closed in so the Kia's license plate became clear for the first time. He asked dispatch to run the plate: "[Inaudible] paper plate, [inaudible] Charles Charles One Three Zero [inaudible]" (17:42:02). He did not yet realize this plate, UCC 1-308, was invalid (*see* Riosbaas ¶¶ 20–21). The results came later.

The Kia did not come to a complete stop immediately. The three-lane Lone Tree Way had no shoulder. So, the Kia went to the first intersection and turned right onto Vista Grande Drive. It had a bike lane in place of a parking strip (17:42:22). But the Kia kept going. Officer Riosbaas said, "[D]oesn't want to stop?!," and told dispatch. (Donahue contends these were red zones, but his cited evidence on this point, assuming it admissible, depicts Lone Tree Way but not Vista Grande Drive (*see* Donahue Br. 6 (citing Dkt. No. 83-1 at 12)).) The Kia again went to the first intersection and turned right, now onto Deerspring Way, and came to an immediate stop — before dispatch had time to finish saying "copy, vehicle is not yielding" (17:42:41). That location had a parking strip alongside homes and opposite a dimly lit park. From first flash of police lights to final stop took 59 seconds.

From the above, parties dispute how readily the Kia stopped, and whether it stopped in a safe neighborhood — and if either gave grounds for Officer Riosbaas to prolong the stop. *Construed to favor Donahue*, of course a reasonable jury could find the Kia's failure to stop on Lone Tree Way was unremarkable. But no reasonable jury could find that failure to stop on Vista Grande was not a circumstance that would prompt an officer to ask questions. The delay was noteworthy, even if there was a reason for it. A jury could find Deerspring Way itself safe for the officers for the duration of this stop.

4

### (i)    Gathering Information.

This section sets out the facts leading up to the call for backup.

At 5:43, the cars stopped. The SUV turned on spotlights. The Kia's taillights stayed on.

Within 15 seconds of stopping, Officer Riosbaas learned from dispatch that the license plate was not DMV-issued — not even as a temporary one (17:43:07). The plate was bright yellow and emblazoned in black letters with "UCC 1-308." (As Officer Riosbaas was told only *after* the arrest (¶ 21), the plate referenced the Uniform Commercial Code's provision for "Performance or Acceptance Under Reservation of Rights," which some individuals use to challenge government authority.)

Parties dispute what else was seen and heard in the initial stop thereafter.

*According to Officer Riosbaas*, he saw furtive movements and heard yells from the Kia. *As for what could be seen*, he could *not* see through the tinted windows well enough to count occupants while driving (*e.g.*, ¶ 7), yet he could later see well enough to make out that "the person in the driver's seat was making quick movements, reaching toward the passenger side" (¶ 16). Indeed, at the time, Officer Riosbaas radioed dispatch to say, "subject was reaching around his vehicle," though this came after Officer Riosbaas's cadet had said, "[h]e's reaching down to the left" (17:43:22). Some officers attest they could not be sure how many occupants were inside, but Officer Riosbaas and the City of Antioch do not appear to rely on this in their briefing here (City Br. 3–4, 11). *As for what could be heard*, in his brief, Officer Riosbaas argues he heard yelling from the Kia about "jurisdiction" before backup was called (City Br. 4, 11). But his sworn declaration does not pin down the timing. (At this initial stop, the only noise recorded on the dash-mounted camera besides police chatter was the sound of a car passing behind the police SUV (17:43:22); only after backup was called and after Officer Riosbaas had used his police SUV's megaphone to order the Kia to roll down all four windows did any yelling from the car in front register (17:47:30).)

*According to Donahue*, he sat and waited calmly for the traffic encounter to begin, and defendants saw as much. That is what the dash-recorded camera appears to show, except that from its lens not much can be seen through the tinted windows. Donahue cites the statements

5

1    recorded on dash cameras stating the police saw one person inside, and uses this to infer they

2    could see clearly enough to know he was calm (Donahue Br. 31–32).  Donahue also argues (at

3    36) that his iPhone's video recording of this encounter would show the same thing.  As he

4    waited for the encounter to begin, he started to record on his iPhone, "because I knew

5    something was fishy about the whole traffic stop at that point, because I didn't know why I was

6    being pulled over in the first place" (Feb. 27, 2025 Dep. Tr. 24 (sworn)).  (Defendants later

7    took and did not return the phone.)  But in so attesting, Donahue admitted that he "reached in

8    the center console to get my phone."  Whether that reach or any other was visible is disputed.

9        *Construed to favor Donahue*, a reasonable jury could conclude the events were very close

10   to how Donahue presents them.  *As for what could be heard*, a reasonable jury could conclude

11   that Donahue did not yell at the officers during this initial encounter.  *As for what could be*

12   *seen*, the dash-mounted camera makes conclusive that Officer Riosbaas did not have a plain-

13   as-day view into the vehicle.  A reasonable jury conclude officers were able to see well enough

14   to conclude the car had only one occupant — but not so well to make out clear movement.

15       In sum, the slow stop, false license plate, and tinted windows (making seeing inside

16   challenging) were evident circumstances.  No reasonable jury could find otherwise.

17           *C.*    ***THE PROLONGED STOP.***

18       At 5:43 p.m., dispatch called for backup.  This led to prolonging the stop, and ultimately

19   to an arrest, iPhone seizure, handcuffing, and vehicle search.  This account hews to the dash-

20   and body-mounted cameras, noting where Donahue points out gaps or ambiguities.

21           *(i)*    ***The Wait for Backup and Repeated Orders.***

22       In the build-up to threats of lethal force, parties dispute some of the circumstances.

23       At 5:43 p.m., Officer Riosbaas now told his trainee it was okay to "stand outside."  The

24   cadet moved the SUV's floodlights on the Kia.  Donahue argues this shows the scene was safe.

25       At 5:44 p.m., Officer Riosbaas began instructing the Kia through the SUV's megaphone:

26   "Driver, shut off your vehicle."  The Kia appeared to turn off about a minute later, after a third

27   such order.  Officer Riosbaas argues this and other patterns indicate the Kia's driver, Donahue,

28   was not compliant.  Such patterns continued.

United States District Court
Northern District of California

At 5:45 p.m., Officer Riosbaas next began instructing the Kia:  "Driver, roll your windows down."  "Roll all four windows down."  But the Kia's rear windows were unable to be rolled unless the engine was on (Donahue Dep. Tr. Vol. II 79–80).  (There is no contrary evidence on this, nor on the point that the officers did not immediately know as much.)  The Kia's brake lights went back on.  (Officer Riosbaas attests this made him think it might flee (*see* ¶ 27–28).)  Officer Riosbaas radioed to dispatch the Kia was not rolling down windows.

At 5:47 p.m., yelling for the first time became audible from the Kia on Officer Riosbaas's recorded cameras.  Officer Riosbaas responded:  "Driver, do what you need to do to get your windows down."

At 5:47 p.m., an arm finally shot out of the Kia's driver window, holding a card or booklet in hand.  Officer Riosbaas shouted, apparently prompted by something he heard:  "Real quick:  What do you mean I don't have jurisdiction?"  (Donahue does not dispute he contested the officer's jurisdiction, but says he meant the officer had no reason to stop him.)  Officer Riosbaas radioed to dispatch that the driver had said he was a "sovereign citizen."  (Donahue does not dispute that Officer Riosbaas broadcast this statement, but asserts that he, Donahue, did not state he is a *sovereign citizen* — because he is a state national, which holds different beliefs (*e.g.*, Feb. 28, 2025 Tr. 14–16 (sworn).)  The hand remained outside the window waiting for about a minute before withdrawing.  Donahue argues this indicates he was compliant (*e.g.*, Donahue Exh. 22).

Such cycles recurred.  At 5:49 p.m., for instance, Officer Riosbaas again ordered the driver to roll down all windows, the brake lights went back on, the hand came back out of the driver window.  "Driver, I'm asking you to do a lawful order, for your safety, and for my safety" (17:50:58).  "Driver, roll down all four windows, and turn your vehicle off" (17:51:49).  And so on.  In total, more than a dozen orders were given to roll down windows.  Ultimately, the front windows were rolled down until only a few inches of glass protruded.  The rear windows were never rolled down.  The car was turned back off.

So, it is uncontested Donahue did not roll down the back two windows, Donahue shouted to the officer that he did not have jurisdiction, and the Kia's taillights flared up multiple times.

United States District Court
Northern District of California

### (ii)     *The Arrival of Backup and the Plan of Arrest.*

Parties further dispute the circumstances evident to backup officers as they arrived.  The arriving officers attest they had heard the following over dispatch (it can be heard on tape):

> (1) the suspect had not pulled over immediately;
>
> (2) the suspect's vehicle lacked a valid license plate;
>
> (2) the suspect had not complied with orders;
>
> (3) there was only one suspect in the vehicle (17:50:02);
>
> (4) and, the suspect was a sovereign citizen — which responding officers attested they understood to be a person who refuses to comply with authorities.

*Officer Shawn Marques* arrived at 5:52 p.m., parking behind Officer Riosbaas's police SUV.  He approached Officer Riosbaas's tailgate.  Officer Riosbaas told him, "So, this guy says he's not going to roll down his windows."  Marques peered down the driver's side of the SUV to the Kia:  "His window's down."  Officer Riosbaas clarified:  "His uh, back windows."

Each officer left cover to walk down opposite sides of Officer Riosbaas's police SUV, peering at the Kia.  Officer Marques, on the driver's side in the street, did not walk past the front door of the police SUV (then closed).  Officer Riosbaas, on the passenger's side on the sidewalk, walked past the SUV's open front door and bumper to point his flashlight at the Kia — which Donahue asserts shows he did not fear the Kia (Donahue Exh. 23).  Both officers returned to the front doors of the SUV — with Officer Marques now opening the driver's door to stand behind it.

*Officer Brandon Bushby* arrived at this point, 5:52 p.m. (45 seconds after Officer Marques).  He parked behind Officer Marques's police SUV.  He grabbed an AR-15 rifle, exited his vehicle, and walked towards Officer Riosbaas, who was just returning to cover as above.  Officer Bushby was from the K-9 unit, and after he arrived a dog was heard barking.  No police dog was ultimately deployed at the scene, however (as is uncontested).

At 5:53 p.m., Officer Bushby asked Officer Riosbaas, "Whad'da we got?"  "Ah, he's just refusing to comply with orders I've given him.  Says he's a sovereign citizen and I don't have jurisdiction.  And, we want to have him step out of the vehicle because of all [inaudible], and

8

not complying." Having walked together to reach Officer Marques behind the open driver's door, Officer Bushby then told both he would take a position back on the passenger side.

The officers then "talk[ed] technics." The officers' cameras then muted, but the dash-mounted camera remained recording audio through the open doors. Officer Riosbaas asked the Officer Marques, "How should — should we have him come back to us?" The newly arrived Officer Marques answered, "Yeah, um, that'd probably be the best. Cause if we go up on him and he's got someone in the car — know what I'm saying? At least if you have him come back here — " (17:53:28).

Officer Riosbaas agreed: "So, have him step out of the vehicle."

### (iii)    *The Order to Exit the Vehicle, with Guns Drawn.*

Immediately after this decision — 45 seconds after Officer Bushby arrived and 1 minute 30 seconds after Officer Marques arrived — Officer Riosbaas ordered through the police SUV's megaphone: "Driver step out of the vehicle. Keep your hands visible. Keep your hands up" (17:53:50).

The officers were arrayed on either side of the police SUV: Officer Riosbaas was posted to the left of the driver-side door, beyond cover. It is uncontested that Officer Riosbaas did not draw his weapon. Officer Marques was posted just to his right, behind the cover of the SUV's driver-side door, with his gun drawn and pointed downward into the bottom of the car door (as the video evidence puts beyond dispute). Officer Bushby was posted behind the SUV's passenger-side door, with his AR-15 drawn and poised to point at Donahue (again as the video evidence puts beyond dispute). The officers told dispatch the driver was not complying. They repeated orders.

At 5:54 p.m., Officer Bushby then said loudly: "We don't want this to escalate any further, man. Just step on out and talk to us, please." The video evidence makes clear that no one had yet ordered Donahue what he should do once he came out of the vehicle (walk one way or the other, backwards or forwards, etc.), contrary to later officer statements.

The Kia's driver door opened, fully visible to the two officers on the driver's side of the police SUV. Donahue visibly held a phone in his right hand (recording the encounter), and a

card or booklet in his left.  He turned to face the officers.  Just as the Kia's door opened, Officer Bushby lifted his rifle up off a resting point on the police SUV's door frame (Bushby 17:54:27).  Parties dispute what he could see and whether he pointed his firearm at Donahue.

*As for what Officer Bushby could see*:  From the video footage, it is obvious Officer Bushby was unable to see even Donahue's hands when Donahue first exited his Kia (Officer Bushby was standing on the passenger side of the police SUV).  And — two seconds later — it is also obvious Officer Bushby could now see Donahue's hands, but still could not see inside the open doorway of the Kia.  Donahue remained standing in that open doorway as he began to shuffle to face the officers.  Donahue had a baggy sweatshirt, and his hands began to sag downwards as he later took one step towards the officers, while asking "What?" (below).

*As for whether Officer Bushby pointed his firearm at Donahue*:  Officer Bushby maintains he pointed his firearm downwards in a "low ready position" (¶ 9).  That statement is flatly contradicted by the video footage.  That footage shows Officer Bushby jerk his firearm off its rest to point it at Donahue as Donahue emerges from the vehicle.  No reasonable jury could find otherwise.  (Indeed, Officer Bushby impeaches himself when he later attests to having "lowered my weapon" after Donahue was subdued, or so a jury could find (¶ 11).)  Officer Bushby furthermore warned he might use lethal force, in a direct tone while asking for compliance:  "Keep your hands up.  Keep your hands up, please.  [inaudible]  We're not gonna shoot ya as long as your hands are up — keep your hands up" (17:54:25).  He kept his gun pointed at Donahue for 16 seconds total, until Officer Riosbaas neared contact with Donahue, or so a jury could find.

While Officer Bushby was still pointing his firearm at Donahue, he told Officers Riosbaas and Marques to "go ahead and 10-15."

For the first time for any officer, Officer Bushby then ordered Donahue:  "Face away from us sir."  Donahue said, "What?," and turned with one step towards Officer Bushby, with his hands lowering.  "Face away from us please and get your hands up."  Donahue put his hands back up and began rotating a half turn to his right (17:54:34).

United States District Court
Northern District of California

1    As Donahue was turning away, Officer Riosbaas was already approaching with his gun

2    now holstered (Marques 17:54:30).  Donahue turned partly back towards the approaching

3    officer, looking through his iPhone's camera at the officer.  Officer Marques followed with his

4    gun drawn at a "low ready," pointed downward (Dash 17:54:37).  Officer Bushby put his rifle

5    down and approached the group.

6    Just then, Officer Ryan Geis arrived and parked his police SUV in front of the Blue Kia.

7    Officer Bushby walked past the group handcuffing Donahue and pointed his gun into the

8    Kia to see if other passengers were inside, as he explained to Donahue.

9    At 5:54, Donahue was put in handcuffs by Officer Marques, with Officer Riosbaas

10    holding him.  Officer Riosbaas alone walked Donahue to the back of his police SUV.  Neither

11    side takes a position on whether the officers patted down Donahue before handcuffing him or

12    placing him in SUV; the video record does not appear to show a pat down.

13    In sum, it is undisputed that one officer did not draw his firearm and that two officers did,

14    and it is beyond dispute that one of those two, Officer Bushby, pointed his weapon at Donahue

15    for 16 seconds from the time Donahue exited the vehicle until he began rotating away.

16    ***(iv)      The Seizure and Loss of the iPhone.***

17    It is undisputed that Officer Marques seized Donahue's iPhone while arresting him but

18    disputed whether he later placed the iPhone where it would be lost intentionally, and as part of

19    a broader pattern or practice.

20    At 5:54 p.m., while handcuffing Donahue, Officer Marques took Donahue's light-colored

21    iPhone from Donahue's right hand and placed it in his own breast pocket (Police Reports 19).[3]

22    At 5:55 p.m., as Officer Riosbaas walked a handcuffed Donahue to Officer Riosbaas's

23    SUV, Officer Marques slowed down and removed the iPhone from his pocket as they walked

24    ahead.  The screen of the phone showed an ongoing video recording, or so a reasonable jury

25

26

27    ───────────

3    The initial police report by Officer Riosbaas was followed by an investigative report by Officer
Arturo Becerra and a review by then-Officer Evans regarding the phone, all assembled in one file
28    and cited using the blue ECF pagination (Dkt. No. 146-13, Riosbaas Exh. E).

could conclude (17:55:04). Donahue, at the same time, said, "Where's my phone at?" Officer Marques appeared to press the phone, setting off a beep. "Why you shut off my phone, man?"

Officer Marques regained Officer Riosbaas and Donahue, switching the phone to his left hand. With his freed hand, he opened the rear door of the police SUV, just as Officer Jacob King appeared to help Officer Riosbaas handle Donahue (Marques 17:55:09; King 17:55:09).

Now on his own side of the opened door separating him from the two other officers and Donahue, Officer Marques reached up to the top of the police SUV and placed the phone on its roof, or so a reasonable jury could find. Supervising Officer Evans later said this appeared visible in the open door's reflection, and a thud can be heard (Marques 17:55:10–15). And, a hand placing an object on the roof at that time is visible from Officer King's body-worn camera, looking from the opposite side of that same door towards where that door meets with the roof (King 17:55:10–15). At this time, the front passenger side door appeared open. So, Officer Marques was standing in the opening between the two open doors. That would mean Officer Marques reached past the open, front-passenger seat to place the iPhone on top of the roof above the front-passenger seat — or so a reasonable jury could find.

Officer Marques then stepped wide of both still-open doors and took a full spin around, during which he saw the cadet watching him, a jury could also find based on the videos. Officer Marques completed his spin until he again stood facing the SUV. He closed its front-passenger door. Then he walked to the Kia. The cadet reopened the same door. (No testimony from the cadet is in evidence, and no testimony exists from the officers about anything said or not said to the cadet.)

Throughout the stop, Donahue asked about, requested, or mentioned his phone at various points. And, at the end of the stop, Donahue asked for his phone as he was transferred from Officer Riosbaas's police SUV to Officer Nieves's vehicle, or so a reasonable jury could conclude based on less clear audio (Nieves 18:40:30). Donahue's wallet — but not his iPhone — was ultimately handed in a property bag to Officer Nieves (Smith 18:40:19).

More fiercely disputed by parties than the action is any awareness and intent of the police officers and department. Several officers have provided some statements regarding this.

1    Officer Marques acknowledged he seized the iPhone, but said he could not recall where

2    he put the iPhone next (¶¶ 11, 16–17).  "After reviewing my body-worn camera (BWC)

3    footage, I concluded that I must have placed the phone on or in the patrol vehicle while

4    assisting Officer Riosbaas in securing Plaintiff inside."  He narrowed his account:  "I believe

5    Plaintiff's phone was placed on Officer Riosbaas's patrol vehicle."

6        Weeks after the arrest, Supervising Officer Evans personally responded to Donahue's

7    after-action inquiries about his iPhone, prompting a search by Officer Riosbaas.  Officer Evans

8    filed a supplementary report, which for the most part conforms to the events outlined above,

9    but does not mention having reviewed Officer King's body-worn camera footage:

> I reviewed the BWC footage from the incident and on Ofc
> Riosbaas dashcam, I could see that King David was holding a cell
> phone in his right hand as he was standing outside the vehicle.  Ofc
> Riosbaas and Ofc Marquez approach King David and detain him in
> handcuffs and it appears Ofc Marquez takes the cell phone from
> King David and places the cell phone in his left breast vest pocket.
>
> I then reviewed Ofc Marquez's BWC and it shows him take
> possession of the phone while detaining King David in handcuffs.
> As King David is being walked and placed into the patrol vehicle,
> Ofc Marquez appears to be holding the phone and at one point
> King David refers to it as "my phone".  Ofc Marquez assists Ofc
> Riosbaas by opening the rear patrol vehicle door with his right
> hand and it appears that the phone is in his left hand.  Ofc Marquez
> then walks towards the open front passenger door and in the
> reflection of the rear window, it appears as if he places something
> on the roof of the patrol vehicle.  Ofc Marquez then shuts the door
> and walks back to the suspect vehicle.  There was no audio
> mentioning anything about the cell phone.

20   (Police Reports 19).  Officer Evans then instructed Officer Riosbaas to check his patrol

21   vehicle, which by that time, weeks later, did not contain the iPhone, according to the report.

22       Both Supervising Officer Evans and Officer Marques each concluded their accounts of

23   this incident with a statement about how commonplace were the practices leading to this

24   occurrence for the Antioch Police Department.  According to Supervising Officer Evans:

> It is not uncommon practice for officers to place items on or in
> vehicles for safekeeping while they are dealing with suspects
> because it is not safe to try and do so with items in their hands.  It
> is my opinion, based on the video, that the phone was placed on
> the patrol vehicle and in the commotion of everything going on, it
> inadvertently did not get moved into the property bag of King
> David.

(*ibid.*). According to Officer Marques: "It is common for officers to place items on or in patrol vehicles for safekeeping while handling suspects" (¶ 17). Here, "amid everything happening, it was inadvertently not transferred to Plaintiff's property bag." Similarly, when early in our proceedings, the Court asked: "How come you've never returned his iPhone?," Counsel for City of Antioch summarized, unsworn: "The facts are, they were left on top of the car and, unfortunately, it was either lost or destroyed" (Oct. 24, 2024 Tr. 8–9).

According to Donahue, the phone was intentionally taken from him and intentionally placed where it would be "either lost or destroyed," so any evidence it contained that could exculpate him or inculpate officers would be lost or destroyed with it. Donahue further asserts that the intentional disappearance of arrestees' items and evidence was common at the Antioch Police Department, and tolerated or encouraged. The events here, the supervisor's after-action report, and defendants' own statements about the common practice of putting items like this "on" patrol cars for "safekeeping" could be construed to support either side — but of course this order must construe the facts in the light most favorable to Donahue.

### (v)    The Handcuffing.

Returning to our timeline: Parties dispute whether the handcuffs were too tight, whether this caused pain or injury to Donahue, and whether the circumstances were such that officers did not have a chance to check them until the stop ended.

At 5:54 p.m., Officer Marques handcuffed Donahue without patting him down, or so a reasonable jury could conclude. Officer Riosbaas was also holding Donahue at this time. Officers Geis and Smith arrived as Donahue was being handcuffed, but were not touching or directing the effort (17:54:53).

Donahue is a big man. He stands 6 feet 2 inches tall. He weighs 240 pounds (18:19:00). Neither officer attested to having checked that Donahue's handcuffs were "double-locked"; another officer attested that he performed such a check when eventually re-handcuffing Donahue because it ensured the handcuffs could not tighten after being placed on wrists (Nieves ¶ 13). Officer Riosbaas then put Donahue in the back of his police SUV with Donahue's hands cuffed behind his back.

14

1    At 5:59 p.m., Donahue was recorded complaining to himself about the tight handcuffs.

2    At 6:02 p.m., Donahue complained to Officer Riosbaas that the cuffs were "super tight."

3    Officer Riosbaas, who was back in the car to work on his center-console computer, heard the

4    complaint but did nothing, or so a reasonable jury could find.

5    At 6:06 p.m., Donahue again complained to Officer Riosbaas. He specifically asked

6    Officer Riosbaas to loosen the cuffs. Officer Riosbaas heard the complaint.

7    At 6:10 p.m., Donahue complained to Supervising Officer Evans, who had begun

8    questioning him. "Can you loosen up these cuffs, though?" Supervising Officer Evans

9    responded: "Uh, we'll have them take a look at them in just a second, alright?" Officer Evans

10   shut the door and returned to the group of other officers standing behind him outside on the

11   sidewalk. Donahue testified that "Evans said, 'Hang tight,' as if, like, it was a joke that I was

12   complaining. . . . [A]ll he told me was to do, 'Hang tight,' and then closed the door on me. . . .

13   It wasn't a big deal to him that I was suffering from the tight cuffs" (Donahue Dep. Tr. Vol. II

14   at 92–93).

15   In his declaration, Supervising Officer Evans did not attest that Donahue was faking

16   discomfort or did not merit attention under these circumstances.

17   Instead, Supervising Officer Evans attested: "It would not have been consistent with my

18   training, custom or practice for me to exchange and/or adjust the handcuffs on Mr. Donahue

19   [myself] because I was not the handcuffing officer and the cuffs were not mine" (¶ 22). (The

20   officer who at the end of the stop exchanged the cuffs was not the arresting officer and the

21   cuffs were not his; that officer arrived on the scene as early as 6:14 p.m.)

22   Supervising Officer Evans further attested: "While I do not specifically recall relaying

23   Mr. Donahue's complaint about the handcuffs to anyone, as a supervisor on scene, it is my

24   custom and practice to do so, particularly to the arresting officer, and I have no reason to

25   suspect that I did not follow my customary practice" (¶ 23). If such information was relayed,

26   the officer(s) informed would have been Officer Riosbaas and/or Officer Marques.

27   At 6:19 p.m., Donahue complained again to Officer Riosbaas. "These cuffs is super

28   tight. You're cutting off all my circulation in my hands. My hands are starting to get numb as

hell." Officer Riosbaas did not respond. Donahue pressed again: "Can they loosen these up? I'm starting to lose circulation." Finally, Officer Riosbaas responded: "We'll get to that as soon as we can, okay?" Donahue said: "I shouldn't be in handcuffs in the first place."

No officer adjusted Donahue's handcuffs for another 20 minutes.

At about 6:37 p.m., Community Service Officer Nieves opened the door of Officer Riosbaas's SUV where Donahue was being held and escorted Donahue to the SUV's hood. He told Donahue he would do a quick pat down, per policy (¶ 9). After pat down, Officer Nieves began to replace the original handcuffs with a new set for transporting Donahue to jail. As he began to touch Donahue's hands, Donahue winced, a jury could find, "Ah, mannn" (Smith 18:38:05). Officer Nieves said, "I'll fix the handcuffs, okay? I've got to put mine on here first." He turned Donahue's hands further into a position where he could work on them, and Donahue exclaimed, "Ouhh!" (Smith 18:38:10). Officer Nieves worked to replace the one set with another for over a minute. On top of the existing handcuffs, he put a set of handcuffs on Donahue, these allowing Donahue's hands to rest closer to shoulder width behind his back.

Although the new handcuffs allowed Donahue's hands to rest further apart, Donahue attested that he continued to be in "excruciating pain" from the discomfort that had intensified during the exchange of handcuffs. He sat in the transport vehicle in pain, he attested, complaining further at least to Officer Nieves, with no further response from officers during the 10 to 15 minutes he sat before departing (Donahue Dep. Tr. Vol. II at 96).

This order pauses to note where other officers say they were during this encounter:

- At 5:54 p.m., Officer Geis arrived. "I did not assist in detaining or handcuffing Plaintiff. I did not draw or display my firearm during the incident. . . . I did not take part in the inventory search of Plaintiff's vehicle . . . . In the video at 6:20 p.m., I am the officer standing to the right of Officer Riosbaas's patrol vehicle on my phone" (¶¶ 9–13). His only stated involvement was to assist Officer Nieves to transfer Donahue and adjust his handcuffs — at the end of the stop. Officer Geis affixed a video still showing him using a smartphone and circled in red to illustrate that, while he was near the activity, his participation was not needed (¶ 13).

- By 5:54 p.m., Officer King had arrived. In an unsigned declaration, and thus discounted by this order except as it can be construed against him, he observed the handcuffing, assisted in putting Donahue into the back of the police vehicle, and

16

United States District Court
Northern District of California

participated in the vehicle search, but otherwise did not say he was
occupied during the stop (¶¶ 8–11 (unsigned)).

- By 6:02 p.m., Officer Smith arrived, shown in Officer King's
  body-worn camera.  Officer Smith disclaimed involvement in
  everything but the search of the vehicle, which began at 6:19 and
  culminated "[a]bout one minute into the inventory search" when a
  weapon was found (*see* ¶ 8–10).  Various officers contend activity
  related to the search continued until 6:27 p.m., but a reasonable
  jury could find the search did not necessitate the involvement of all
  officers on the scene.

- At 6:14 p.m., Officer Nieves arrived.  He disclaimed involvement
  in everything except — after reparking his vehicle closer at
  6:34 — finally adjusting Donahue's handcuffs and readying him
  for transport to jail, as above (¶¶ 6–16).

A reasonable jury could find officers on the scene available to assist.

As a result of the handcuffing, Donahue testified that his hands became numb and that by
the end of the stop he felt pain in "my arm, my shoulder, and now it went - - and it went all the
way to my neck.  I was - - I was in excruciating pain" (Dep. Tr. Vol. II at 96).

Skipping ahead in our narrative, Donahue received a check-up at Brentwood Health
Center several weeks after (*id.* at 112).  He attested to a medical record and was crossed by
defense counsel respecting it, including in part before the Court.  Dr. Jasen Tjahjadi wrote in
the disputed record: "Left Hand pain after being cuffed, likely mild swelling and strain causing
median nerve impingement.  Will give wrist brace" (Donahue Dep. Tr. Vol. II Exh. 13).

### *(vi)      The Decision to Tow the Car and Search.*

Parties dispute some facts underlying the search of the car.

Recall Donahue was stopped for a traffic citation and handcuffed before his vehicle was
searched.  Within the first ten minutes, Officer Riosbaas determined Donahue's driver's license
and vehicle registration had expired more than six months prior, in April 2022 (*see* Bittner
Decl. Exh. A (query results); Riosbaas Decl. Exh. F (blotter)).

Meanwhile, early in the stop, multiple officers peered through the still-open driver's door
and front-passenger window into Donahue's vehicle — but none entered, as recorded by
Officer Riosbaas's dash-mounted camera trained on the Kia.  For instance, one officer said
about such a look, "Anything visible?"  (*E.g.*, Donahue Exh. 25).  Donahue contends the
officers were already searching the vehicle and seeking for some excuse to search the vehicle.

At 6:13 p.m., Officer Riosbaas began asking Donahue if anyone could come pick him up and the vehicle. Donahue said yes. Officer Riosbaas also asked, "Okay, they're going to have a valid driver's license?" And, Donahue answered, "Yeah, I have a valid passport" (18:14:20). After this exchange, Officer Riosbaas shut the door to the SUV. This was 6:14 p.m.

At 6:15 p.m., body-worn camera footage and the dispatch event blotter (Riosbaas Decl. Exh. F) support that a determination was made the vehicle would be towed pursuant to a citation for reckless driving. A tow request issued (Riosbaas Decl. Exh. F). The Antioch Police Department has a policy to inventory cars, which includes opening containers therein (Bittner Decl. Exh. B). Donahue challenges that the above use of this policy here was pretextual or papered over but does not provide any evidence to support this.

At 6:19 p.m., officers opened the car and crawled inside. Officer Marques started on the driver side, Officer Evans on the passenger side, and Officer Bushby in the trunk. Officer King and Officer Smith hovered outside, with Officer King taking notes, according to their body-worn cameras and dash-mounted camera trained on the vehicle. Within a minute, Officer Evans opened a black backpack inside the car and exclaimed: "Oh, there's a pistola – with a switch!" (Marques 18:20:19). A conceal-carry "bellyband" was also found. Donahue points out that one of the officer's reports states the gun was found inside the backpack, and the other found inside the middle compartment of the car (Police Reports 15, 17). The latter states: "I opened the front passenger door and located a black backpack on the front passenger seat. I opened the middle compartment, and saw a Glock pistol which was in a black holster" (*ibid.*). To the extent there is room for different readings — middle compartment of the car or of the backpack? — Donahue does not explain how this would make a difference to any issue.

An inventory sheet was filled out and signed by Officer Riosbaas at the search (or so the form stated) (Riosbaas Decl. Exh. G). Recall that in the dash-mounted and body-worn camera footage, Officer King can be seen walking around the car with a paper or clipboard at the time of the search; Officer Riosbaas is the name on the inventory form. On that form, a checkmark in a column for "YES" is present in a row for "FIREARMS" in a section for "ITEMS" (*ibid.*).

Donahue asserts that the form does not show that a firearm was found inside the vehicle but does not address the checkmark just noted nor produce evidence.

The car was thereafter towed and impounded (addressed below).

### D.    THE JAILING AND JUDICIAL PROCESS.

#### (i)    Judicial Determination of Probable Cause.

A probable cause declaration was prepared to justify holding Donahue. What it stated and if and when a judge signed it will matter later to our legal analysis.

The declaration here was prepared by Officer Nieves with a statement by Officer Riosbaas. It provided as follows (Hurley Decl. Exh. F):

*A reported time of arrest* of 6:40 p.m. on January 6, 2023. (No dispute about a constructive time of arrest has been raised, and none would have been material for the legal arguments about timing of judicially determined probable cause or arraignment, as below.)

*Offenses of arrest* of one misdemeanor (reckless driving under California Vehicular Code Section 23103), and *two felonies* (illegal possession of an assault weapon, and illegal making or modifying of an assault weapon under Penal Code Sections 30605(A) and 30600(A)).

*A narrative* as follows, attributed to Officer Riosbaas:

> While driving Eastbound on Lone Tree Way I observed a vehicle driving at a high rate of speed and swerving in and out of traffic at a dangerous pace. Other vehicles had to maneuver to avoid colliding with the suspect vehicle. I pursed the vehicle and paced the vehicle traveling at a speed of 75 mph in a 45 mph. I conducted a traffic stop by activation my solid red forward-facing lights and sounding my siren. The vehicle did not immediately yield to during my stop and continued driving from Hillcrest and Indian Hill Dr to Deerspring and Vista Grande Dr. The driver pulled into a low light area with little traffic and no houses facing area of the stop. I instructed the driver to shut off his vehicle and roll down his windows. The driver did not comply and was uncooperative throughout the stop. The driver later identified as King David Donahue via Aries stated he was a sovereign citizen and did not need to comply with my lawful orders. The vehicle was towed per sec 23109.2 [which permits towing for reckless driving, among other offenses not relevant here], As a result of completing an inventory of the vehicle a firearm that was registered to King was discovered in the front passenger seat. The firearm had a modification and selector switch to operate as an assault weapon. Subject was transferred and booked at MDF for the above charges.

This declaration was then purportedly submitted for the approval of a judge through the Automated Regional Information Exchange System (or ARIES), raising factual disputes.

*According to the County of Contra Costa:* At 2:18 a.m. on January 7, 2023, a time stamp was added where a judge's signature should go to certify probable cause, without appending a judge's name (Hurley Decl. Exh. F at 3).



The Contra Costa County Superior Court's chief counsel, Matt Malone, attests a computer system records all activity related to this digital declaration — from an officer's preparation of the form to a judge's approval (Exh. H (Malone Decl.)). We are told that the above approval was recorded as being submitted by user "Bhayn@contracosta.courts.[redacted]" (Exh. G).



Chief Counsel Malone further attests to how ARIES works. The email-linked ARIES account above is exclusively used by Superior Court Judge Brian Haynes. The log confirms he signed the form at 2:18 a.m.

*According to Donahue:* These forms could be fabricated. But Donahue presents no admissible evidence to undercut their authenticity or the system's mechanical effectiveness.

United States District Court
Northern District of California

United States District Court
Northern District of California

### (ii)    Timely Arraignment.

There is no dispute as to whether and when Donahue was arraigned — only the legal significance of the agreed timing. To get the facts on the table:

Donahue was arrested Friday after 5:40 p.m. and finally arraigned Wednesday at 1:35 p.m. (Exhs. O–P). That's more than 100 hours from January 6 to January 11. Those hours included weekend and after-hours times, as addressed below. Donahue does not present any evidence that there was unnecessary delay in his processing.

### E.    THE POLICEWORK AND PROSECUTION.

### (i)    Conspiracy.

Parties do not dispute that some body-worn camera footage is incomplete, but dispute what, if anything, might explain why (and later whether this makes out a rights violation).

*According to Donahue*, throughout the stop, some officers muted and unmuted body-worn camera's audio. And, some appeared not to record even video, at least when they arrived. For instance, Donahue points to a moment when he asserts all body-worn cameras are muted (Donahue Exh. 26 (citing 18:06:10)). Donahue would ask the factfinder to fill these gaps with negative inferences, and even to find a broader conspiracy (Donahue Br. 48–49). Relatedly, Donahue points to the police reports as containing misstatements or inconsistencies, as set out above. But aside from such assertions, Donahue provides no evidence of conspiracy in our case. Rather, he cites to policy documents about what he says should be done, and to scandals regarding text messages sent nearly two years ago mostly by officers not in our case (*see id.* at 43–44). (Supervising Officer Josh Evans does appear here, but without an obvious bridge between those events and these.)

*According to defendants*, in multiple declarations, officers concede the gaps in the body-worn cameras but contend they do not suggest conspiracy but mistake or an effort to obscure tactics from public dissemination (to not aid those seeking to evade or injure the police). In argument, they also state there is no practical consequence when all camera tapes are collaged to reduce the gaps. (Not all gaps appear to be eliminated, as just discussed above.) As an example of a gap initially alarming to Donahue, Officer Riosbaas and Officer Marques both

muted their body-worn cameras to "talk technics" just before using force to arrest Donahue. But on review, a third camera (the dash-mounted one) records them talking for the duration. They talk about whether to ask Donahue to step out of the car or not, as outlined above.  As for the detective work, Officers Koch and Becerra back their police work with sworn statements.

### (ii)    False Prosecution and Brady Violations.

In the criminal proceeding, Donahue filed a *Brady* request on January 23 (Hurley Decl. Exh. Q).  That request was granted January 24 (Exh. R at 10).  A discovery letter to Donahue states all relevant files and videos were made available to him beginning January 25 (Exh. S).

Donahue asserts some materials were withheld.  For instance, "only 4 dash cameras were produced" and "7 of 8" body-worn cameras (Donahue Br. 48).  (In our case, one body-worn camera — perhaps the eighth missing above — was late-produced because it had been misfiled from the start, as explained in a sworn declaration (Dkt. No. 135-1 Bittner Decl.).)  Donahue does not provide other evidence for any withholding nor for the specific facts he believes these would have contained nor the injury of his they would have allayed.

Donahue provides no evidence of the prosecutorial team taking on an investigative role.

### 2.    PROCEDURAL HISTORY.

#### A.    REACHING THE OPERATIVE COMPLAINT.

Appearing pro se and in forma pauperis, Donahue filed his complaint in October 2023. Early in the case, the Court more than once suggested plaintiff might wish to obtain counsel, and afforded time for him to do so (*e.g.*, Dkt. No. 34 ¶ 5).  Donahue did not obtain counsel.

Donahue entered a second amended complaint after some initial false starts.  All defendants were properly served (or waived service).  All moved to dismiss.  An order sustained most of Donahue's claims, and granted leave to amend (*see* Dkt. No. 89).

Donahue then filed a supplementary complaint, forming the operative third amended complaint.  That complaint comprised the claims sustained in the second amended complaint (Dkt. No. 42 ("Body")), and the claims revived by the supplemented complaint (Dkt. No. 113 ("Supp.")).  An order set out the operative complaint to parties (Dkt. No. 118).

Crafting this third amended complaint proved more difficult than it should have been for plaintiff because of production failures by certain defendants. The Court had compelled the City of Antioch and related defendants to produce basic information about which officers corresponded to which body-worn cameras. Decoding the cameras proved as difficult for defendants as for Donahue, however (*see* Dkt. Nos. 89, 101, 104, 114, 118). Ultimately, defendants did provide all the information to decode the individuals so that Donahue could match names to numbers and complete his third amended complaint (Dkt. No. 116). The Court also compelled other productions, some on each side, and addressed various motions to sanction, some on each side — as our abundant docket chronicles.

Because of these discovery delays mainly caused by the City of Antioch and related defendants, the Court declined to hear further motions to dismiss. We had had enough rounds. It "was time to get on with discovery and to resolve the case on the actual facts, not the alleged facts, and on summary judgment (or trial), and not on more motions to dismiss" (Dkt. No. 114). All defendants filed answers (Dkt. Nos. 120, 122, 123).

## B. THE OPERATIVE COMPLAINT.

Donahue's operative complaint asserted constitutional violations under Section 1983 (Dkt. No. 118). It numbers "counts," or claims for relief. Reorganized by event, they are:

| Count | Event | Constitutional Tort | Defendant(s): |
|-------|-------|---------------------|---------------|
| 1 | Roadside Stop: Initial | IV   *Unlawful Seizure of Person* | • Riosbaas<br>• Bushby<br>• Evans<br>• City of Antioch |
| 1 | Roadside Stop: Prolonged | IV   *Unlawful Seizure of Person* | • Riosbaas<br>• Smith<br>• Bushby<br>• Geis<br>• Nieves<br>• Evans<br>• City |
| 14 | Armed Order to Exit Vehicle | IV   *Excessive Force* | • Riosbaas<br>• Smith<br>• Bushby<br>• Evans<br>• City |

United States District Court
Northern District of California

| 11 | Tight Handcuffing | IV *Excessive Force*<br>XIV *Deliberate Indifference* | • Riosbaas<br>• Geis<br>• Nieves<br>• Evans<br>• City |
|----|-------------------|-------------------------------------------------------|-----------------|
| 9 | Automobile Search | IV *Unlawful Search* | • Riosbaas<br>• Marques<br>• Evans<br>• City |
| 15 | Automobile Impoundment, Return | IV *Unlawful Seizure*<br>XIV *Due Process* | • Riosbaas<br>• Marques<br>• Nieves<br>• Evans<br>• City<br>• County |
| 6 | iPhone Confiscation and Failed Return | IV *Unlawful Seizure*<br>XIV *Due Process* | • Riosbaas<br>• Smith<br>• Bushby<br>• Nieves<br>• Evans<br>• City |
| 3 | Evidence Fabrication (False Police Report / False Probable Cause Declaration) | XIV *Due Process* | • Riosbaas<br>• Evans<br>• Nieves<br>• City<br>• County |
| 4 | Evidence Suppression (Failure to Keep / Produce Body-Worn Camera Footage, iPhone Video Recording) | XIV *Due Process* | • Becerra<br>• Bushby<br>• Geis<br>• Koch<br>• Marques<br>• Nieves<br>• Riosbaas<br>• Smith<br>• Evans<br>• City |
| 16 | Policing False Crime | I *Retaliatory Arrest*<br>IV | • Riosbaas<br>• Bushby<br>• Evans<br>• City |
| 16 | Policing False Crime | I *Malicious Prosecution*<br>IV *Section 1985 Conspiracy* | • Becerra<br>• Bushby<br>• Geis<br>• Koch<br>• Marques<br>• Nieves<br>• Riosbaas<br>• Smith |

United States District Court
Northern District of California

| | | | • Evans<br>• City<br>• Prosecutor Turner<br>• County |
|---|---|---|---|
| 8 | Jailed Without Timely Prob. Cause | IV    *Unlawful Seizure* | • County |
| 13 | Jailed Without Timely Arraignment | IV    *Unlawful Seizure*<br>XIV *Due Process* | • County |
| 5, 2 | Prosecutor Conduct | XIV *Due Process* | • Prosecutor Turner<br>• County |

Donahue seeks $5,000 in lost wages and $35,000,000 in punitive damages (Body 16).

### C.    THE INSTANT MOTIONS.

All parties moved for summary judgment:  Donahue, with a motion, a memorandum, and exhibits (a prior order struck a purported "undisputed" statement of facts) (Dkt. Nos. 125, 127, 128).  Defendants timely opposed plaintiff's motion (Dkt. Nos. 145, 147, 149).  And, defendants filed their own motions (Dkt. Nos. 143, 146, 148).  Plaintiff's motion for summary judgment effectively operated as an opposition to their motions.  Plaintiff late-filed his pointed oppositions that present nothing new (Dkt. Nos. 151–52), and which this order ignores as late-filed.  The Court has jurisdiction (Dkt. No. 89 at 6).

### ANALYSIS

This order proceeds chronologically, taking the legal issues as they come.

### 1.    THE EVENTS RELATED TO THE CITY AND THE OFFICERS.

The City of Antioch and all officers first move for summary judgment on Donahue's Section 1983 claims that they violated his constitutional rights during the traffic stop.

The officers invoke qualified immunity.  That doctrine protects constitutional rights and officers' judgments about them in challenging circumstances.  It requires construing those circumstances for plaintiff, then asking two questions about the officers' conduct therein:  *First*, did the officers violate plaintiff's rights (as a reasonable jury could find)?  *Second*, would a reasonable officer confronting those circumstances have known he was violating those rights under clearly established law (a question for the judge)?  *Peck v. Montoya*, 51 F.4th 877, 887 (9th Cir. 2022).  Either can be assessed first.  *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). If both prove true we go to trial.  This order points out where one, the other, or neither is met.

25

United States District Court
Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### A.    INITIAL STOP:  FOURTH AMENDMENT ("COUNT 1").

At trial, Donahue must show Officer Riosbaas lacked even a particularized reasonable suspicion that Donahue had violated a law (or soon would) when Officer Riosbaas turned on his sirens and pulled over Donahue.  *See United States v. Cortez*, 449 U.S. 411, 417–18 (1981); *United States v. Lopez-Soto*, 205 F.3d 1101, 1104–05 (9th Cir. 2000).

Recall the circumstances construed for Donahue:  Officer Riosbaas sped towards distant taillights on Lone Tree Way.  As he approached at over 60 miles per hour on his dashboard speed towards the car, its brake lights went on.  He drove closer while slowing to 50 miles per hour.  After at least five seconds, the brake lights came off.  The car slipped into the left lane without signaling.  The two traveled for a time within 45 miles per hour, then the Kia changed lanes in an intersection — and Officer Riosbaas turned on his sirens.

That suffices for reasonable suspicion for a traffic citation.

Donahue argues the basis for the stop was pretextual — blown out of proportion to pursue something else.  But, if so, the constitution tolerates pretextual stops.  *Whren v. United States*, 517 U.S. 806, 811 (1996).  (Theories of animus for the stop are addressed below.)

Donahue similarly argues the basis for the stop was made up or mistaken:  He was not really speeding, not really changing lanes without signals — and not recklessly.  But no reasonable jury could conclude Donahue signaled before every lane change.  The dash camera shows otherwise.  *Scott v. Harris*, 550 U.S. 372, 378 (2007).  And, as a constitutional matter, that objective basis is enough to authorize the stop here, even if it was not the exact basis cited by the officer on the scene.  *Whren*, 532 U.S. at 813.

Because Donahue did not suffer a constitutional injury here, he cannot establish the City of Antioch's liability for one, either.  *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986).[4]

As a result, summary judgment on the claim for the *initial* roadside seizure of Donahue ("COUNT 1") is — in favor of defendants and against plaintiff — **GRANTED**.

---

[4]   This point applies in each instance where this order concludes no constitutional violation is established, unless otherwise noted.

1

**B.    PROLONGED STOP:  FOURTH AMENDMENT ("COUNT 1").**

2

At trial, Donahue must show Officer Riosbaas lacked a further basis for prolonging his

3

detention beyond "when tasks tied to the traffic infraction are — or reasonably should have

4

been — completed." *Rodriguez v. United States*, 575 U.S. 348, 354–55, 357–58 (2015).

5

Recall again the circumstances construed for Donahue.  Yes, there was nowhere for him

6

to pull over on Lone Tree Way.  But no reasonable jury could find that Donahue's reasons for

7

not stopping on Vista Grande Drive were as clear to an officer following him — as he drove

8

for another 20 seconds past places others might pull over.  Next, within 15 seconds of coming

9

to a full stop, dispatch confirmed Donahue's yellow "paper plate" was not listed in permanent

10

or temporary license-plate databases.  Finally, Donahue's windows were tinted such that a

11

single occupant could be seen inside, but little else reliably determined (as set out above).

12

Those together sufficed to prolong the stop to call for backup.  Indeed, the lack of a valid

13

license plate itself provided probable cause that a violation had been committed punishable by

14

a fine.  And, that's enough constitutionally for a full-blown arrest for at least the roadside

15

period here.  *Atwater v. Lago Vista*, 532 U.S. 318, 323 (2001).

16

Donahue contends that he was fully compliant:  He was waiting in place for the traffic

17

citation to be issued.  And, his disappeared iPhone recording would have supported as much.

18

And this order credits as much.  But this overlooks the other circumstances that are

19

unavoidable, even as Donahue briefed them.  No reasonable jury could conclude Donahue's

20

rights were violated given the other circumstances the officer still confronted.

21

As a result, summary judgment on the claim for the *prolonged* roadside seizure of

22

Donahue ("COUNT 1") is — in favor of defendants and against plaintiff — **GRANTED**.

23

**C.    ARMED ORDER TO EXIT:  FOURTH AMENDMENT ("COUNT 14").**

24

At trial, Donahue must show the type and amount of force used by Officers Riosbaas,

25

Marques, and/or Bushby to subdue him was excessive compared to the suspected severity of

26

his crime or infraction, his threat to those nearby, and his risk of flight, as assessed by

27

reasonable officers under the circumstances.  *Graham v. Connor*, 490 U.S. 386, 394–95, 397

28

(1989); *Lowry v. City of San Diego*, 858 F.3d 1248, 1256–60 (9th Cir. 2017) (en banc).

United States District Court
Northern District of California

This order considers the government's *Graham* interests first, then the invasiveness of the force, and finally balancing. It concludes that any violation was not clearly established.

### *(i)    The Government's Interests Under* **Graham.**

We use the *Graham* factors to identify the strength of the government's interests.

*The alleged crime was not serious*. Donahue was stopped for a basic traffic citation, whereupon Officer Riosbaas then developed probable cause to believe Donahue was driving without valid license plates. None of this is yet grounds for drawing firearms and threatening lethal force. Defendants do not argue otherwise (City Br. 11).

*The risk of flight was limited:* Yes, Donahue's reasons for not stopping on Vista Grande Drive were ambiguous to an observing officer. But then he stopped. And, yes, he turned his car on and off while Officer Riosbaas waited for backup. But turning his car on was for innocuous reasons revealed at the scene by this point, or so a jury could find: Recall Office Riosbaas confirmed, "Driver, do what you need to do to get your windows down" (17:47:13). These circumstances might bear on safety (below), but a reasonable jury could conclude they no longer supported a risk of flight by the time force was applied.

Moreover, once Donahue exited the vehicle, his risk of flight observably hit zero, or so a jury could find. Donahue is heavyset. He was intently staring through his iPhone's screen at its recording of the officers. As a result, he was taking slow, half-shuffles in place as he rotated towards the officers just the way a 240-pound person looking through a camera would. Defendants do not argue he was by then a flight risk (City Br. 11).

*But the threat to safety for those present was heightened*: Donahue's tinted windows, his rolled-up rear windows, his statement the officers lacked "jurisdiction," and his failure to follow at least some orders contribute to this conclusion, as no reasonable jury could conclude otherwise. True, once Donahue exited, the circumstances changed and cause for concern began to dissipate, but did not disappear — particularly not from all officers' vantagepoints.

Recall that even construed to favor Donahue, the observable circumstances were still such that officers had reduced visibility. Yes, Officer Riosbaas could see well enough to tell dispatch there was only one person inside. But the tinted back windows remained rolled up.

He could not be sure what that person was doing.  He asked that the windows be rolled down.  They stayed up.  Officer Riosbaas, Officer Marques, and the cadet each walked beyond cover to peer over.  But then they came right back.  Behind cover, Officer Riosbaas asked Officer Marques for advice, and he reasoned that because they could not see what was inside, they should not approach but ask the driver to step out.  By the same token, though, the officers could not see furtive reaching inside, despite their contrary statements, or so a jury could find. *Liberal v. Estrada*, 632 F.3d 1065, 1071 (9th Cir. 2011).

Also construed to favor Donahue, the circumstances were such that reasonable officers could believe the driver refused to recognize their jurisdiction, and so would resist arrest.  Donahue shouted to Officer Riosbaas that he lacked jurisdiction.  Officer Riosbaas inferred that, as he told dispatch, "Subject is saying he's a sovereign citizen" (17:47:47).  That was broadcast to the arriving Officers Marques and Bushby.  The latter two attested that from their "training and experience, [they] knew that sovereign citizens often reject government authority and have a history of violent encounters with law enforcement" (Marques ¶ 5; Bushby ¶ 5; *cf.* Riosbaas ¶ 21 (not so attesting)).  Of course, "to rely on his training and experience in drawing inferences from the facts he observes, [the officer's] inferences must also be grounded in objective facts and capable of rational explanation," *United States v. Lopez-Soto*, 205 F.3d 1101, 1104–05 (9th Cir. 2000) (quotation omitted), which raises the next point.

Donahue challenges facts related to this assessment — but none are material to our legal issue.  He contends that when he shouted that Officer Riosbaas lacked jurisdiction, he meant only that the officer lacked probable cause.  He contends he is a state national, not a sovereign citizen.  But none of that refutes the first critical circumstance, nor breaks the key links of the logical chain that follow:  Donahue does not dispute he shouted that the officers lacked "jurisdiction," nor that jurisdiction is something sovereign citizens resist, nor that "Sovereign Citizen is an anti-government group" (*see* Donahue Dep. Tr. Vol. III at 246).  True, the officers do not set a sufficiently strong foundation to credit the officers' further inference, which Donahue does not yet concede, that adherents of these viewpoints take violent anti-government actions with such regularity that pointing guns at them while issuing traffic tickets is without

more reasonable. That last link would require further evidence than our record contains plus a jury determination. *Lopez-Soto*, 205 F.3d at 1104–05; *cf. Fogel v. Collins*, 531 F.3d 824, 830–31 (9th Cir. 2008). But that last link is not necessary to our current decision. The conceded circumstance that Donahue shouted that Officer Riosbaas lacked jurisdiction itself supports a rational inference that Donahue might resist arrest — and it remained uncertain how aggressive any resistance might be. Passive resistance is no justification for using force. *Rice v. Morehouse*, 989 F.3d 1112, 1125 (9th Cir. 2021). Still, reasonable uncertainty about who is "likely to fight back" can be. *Saucier v. Katz*, 533 U.S. 194, 205 (2001).

Finally, Officer Riosbaas told each arriving officer that Donahue had not followed orders. They knew he had not stopped immediately at the outset. They saw rear windows rolled up. (Recall Officer Riosbaas had ordered that they be lowered "for your safety, and for my safety" (17:50:58).) And, each officer observed that Donahue did not exit the vehicle until the order to do so was repeated three times over 30 seconds (17:53:50).

As for any changes to the circumstances as Donahue stepped out, recall the points above about his changing flight risk. Donahue was obviously heavyset and moving slowly. He had his hands up and in one hand was holding a large, flat, white phone, and in the other a booklet or papers. He was wearing a baggy sweatshirt and pants, and as he shuffled in place to rotate towards the officers (he had not yet been ordered to do otherwise) his hands briefly drooped before he was ordered to raise them again, which he did. It was Officer Bushby who ordered him to raise his hands again — consistent with the points addressed next about vantages.

Construed to favor Donahue, the record evidence supports that Officers Riosbaas and Marques almost immediately had a clear view to Donahue and his reaching area after he stepped out of the vehicle, as both these officers and Donahue stood on the same, driver's side of their respective vehicles. That said, no reasonable jury could conclude Officer Bushby had the same clear view of Donahue's full body and reaching area, given Officer Bushby was located on the opposite, passenger side of the police SUV. Donahue remained within the area of the Kia's open driver's door, with his lower body not always in view and the void into the car indisputably never in view to Officer Bushby. Once Donahue faced away from that open

doorway, the officers with the better view approached — as then did Officer Bushby, lowering his firearm (Marques 17:54:30; Riosbaas 17:54:30; Bushby 17:54:30).  Officer Bushby then walked around the other officers and Donahue to peer into the Kia through the open door and raise his firearm again (away from Donahue).  Donahue said, "Don't illegally search my car!"  Officer Bushby said, "I'm not going inside man, I'm making sure no one else is here." He looked, lowered his firearm, and walked away (Bushby 17:54:40).

In sum, no reasonable jury could conclude there were no circumstances present for reasonable officers to have elevated concerns for safety.  And, although a reasonable jury could conclude those circumstances changed after Donahue exited the vehicle, no reasonable jury could conclude they changed as fully and as fast from Officer Riosbaas's perspective.  The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer" in the actual officer's position.  *Graham*, 490 U.S. at 396.

Although the first and second factors do not favor any use of force (construed to favor Donahue), the third and "most important factor" does.  *Thomas v. Dillard*, 818 F.3d 864, 889 (9th Cir. 2016).  That all said, an elevated concern is not a blank check for all kinds of force.

### (ii)     The Type and Amount of Force.

The facts construed for Donahue, detailed in this order's statement, are chiefly these:

*As for drawing and pointing firearms*, Officer Riosbaas did not draw his firearm at Donahue at all.  Officer Marques drew his gun from its holster but kept it pointed downwards as he stood behind the police SUV's driver's door, then continued holding it low and pointed straight down as he approached Donahue and holstered it.  Officer Bushby pointed his AR-15 at Donahue for 16 seconds — from the time Donahue emerged from his vehicle with hands up until Donahue began turning away.

*As for verbal threats*, to prompt Donahue to exit, Officer Bushby said, "We don't want this to escalate any further, man.  Just step on out and talk to us, please" (17:54:17).  Donahue exited with hands up.  As Donahue shuffled in place to face them (not having been told otherwise), Officer Bushby said "Keep your hands up.  Keep your hands up, please."  After Donahue said something (Marques 17:54:22), Officer Bushby said:  "We're not gonna shoot ya

31

as long as your hands are up — keep your hands up."  Generally, it is a factor in favor of officers that they warn suspects.  Withholding warnings and then opening fire would serve no one well.  *See Lowry*, 858 F.3d at 1259.  Officer Bushby's statements were rendered in a direct, level tone.  Still, a reasonable jury could still conclude these amounted to threats, particularly if the jury were to conclude they were not prompted by Donahue first saying, "Don't shoot!"

In sum, the actions applied were  orders to exit the vehicle, a single drawn but down-pointed firearm, and another drawn and pointed firearm, as well as warnings that a reasonable jury could find contained embedded threats of lethal force.

### *(iii)    The Balance of Interests — Clearly Established.*

At trial, Donahue must finally show that the type and amount of force was excessive compared to the above government interests.  *Lowry*, 858 F.3d at 1260.  Otherwise, there is no violation.  But to even make it trial, such force must have been clearly established, too.  *Foster v. City of Indio*, 908 F.3d 1204, 1210 (9th Cir. 2018) (per curiam).  This order chooses to consider first whether any imbalance was clearly established.  *Pearson*, 555 U.S. at 236.

"Neither we nor the Supreme Court have held that merely unholstering a firearm, without more, constitutes excessive force."  *Foster*, 908 F.3d at 1210.  Under the circumstances, the officers had sufficient interests in protecting their safety to warrant unholstering.  Also relevant here, there were three officers, only two drawing weapons on either side of the police SUV, in a situation where one person reasonably believed to be non-compliant and resistant was inside the vehicle with their movements not all reliably in view (even construed to favor Donahue).  *Cf. Washington v. Lambert*, 98 F.3d 1181, 1190 (9th Cir. 1996).  Thus, Officer Riosbaas's and Officer Marques's actions were not clearly established as excessive (if they were at all).

By contrast, "pointing guns at persons who are compliant and present no danger is a constitutional violation."  *Thompson v. Rahr*, 885 F.3d 582, 587 (9th Cir. 2018) (quoting *Baird v. Renberger*, 576 F.3d 340, 346 (7th Cir. 2009)).  But how that simple principle applies in conditions of uncertainty is not always clear.  Prior examples were insufficiently on point:

Take one that comes close on several but not all dimensions:  A woman driving a burgundy Lexus sedan was stopped on suspicion of having stolen a gray GMC truck because, it

United States District Court
Northern District of California

turns out, her license plate number was falsely reported as matching that of the stolen vehicle. *Green v. City & Cnty. of San Francisco*, 751 F.3d 1039, 1043 (9th Cir. 2014).  Relevant officers wondered about the mismatch, but shrugged it off.  When directed "to pull over, she immediately complied." *Id.* at 1043.  No window tinting obscured the responding officers' view inside, though it was dark out.  And, it "was undisputed that [the woman] was wholly compliant and nonresistant." *Id.* at 1044.  When up to six officers arrived, they ordered her to exit the vehicle.  It was immediately clear then that they were dealing with a woman slight in stature, though heavyset.  While up to five "officers kept their weapons trained on [her], [the responding officer] directed her to lower to her knees where he proceeded to handcuff her." *Id.* at 1043.  That was excessive.  But that case and ones like it would not have put reasonable officers in our circumstances on notice that the conduct here was a violation (assuming it was). Here, there was a delayed stop and a failure to perform what was ordered, probable cause for an arrest, tinted windows, and a tall man — and even so the use of force was more restrained.

Other classical presentations of firearm pointing did not suggest any prohibition here — those other cases being of pointing firearms at children, people away from reaching areas and obviously unarmed, or already in handcuffs.  *E.g.*, *Robinson v. Solano Cnty.*, 278 F.3d 1007 (9th Cir.2002) (en banc); *Tekle v. United States*, 511 F.3d 839, 845–46 (9th Cir. 2007).  Recall here that as soon as Donahue had rotated halfway around, all guns pointed down.

As a result, summary judgment on the claim for excessive force related to the armed arrest ("COUNT 14") is — in favor of defendants and against plaintiff — **GRANTED**.

### D.    HANDCUFFING: FOURTH AMENDMENT ("COUNT 11").

At trial, much as we just discussed, Donahue must prove that the type and amount of force — here tight handcuffing while also confined in a police vehicle for about 45 minutes — was excessive when compared to the government interests under *Graham*.  Material disputes of fact make obvious that this issue must proceed to trial as to Officers Riosbaas and Evans.

Our case law is summarized well summarized by Judge David O. Carter:

> As the Ninth Circuit has stated, "[t]he issue of tight handcuffing is usually fact-specific and likely to turn on the credibility of the witnesses[,]" thus it typically remains a question for the jury.

> *LaLonde v. County of Riverside*, 204 F.3d 947, 960 (9th Cir. 2000).

> Further, the Ninth Circuit has been hesitant to recognize qualified immunity defenses at the summary judgment stage regarding the use of handcuffs. *See, e.g.*, *Palmer v. Sanderson*, 9 F.3d 1433, 1436 (9th Cir. 1993) (affirming district court's denial of summary judgment on qualified immunity grounds where plaintiff claimed that officer handcuffed him so tightly that cuffs caused "pain and left bruises that lasted for several weeks" and officer presented no evidence justifying such tight handcuffing or refusal to loosen the cuffs after plaintiff complained); *Wall v. Cnty. of Orange*, 364 F.3d 1107, 1109-10, 1112 (9th Cir. 2004) (reversing district court's grant of summary judgment on qualified immunity grounds where officer handcuffed plaintiff in an "extremely tight" fashion that caused pain and lasting nerve damage because "[i]t is well-established that overly tight handcuffing can constitute excessive force"); *Meredith v. Erath*, 342 F.3d 1057, 1063 (9th Cir. 2003) (holding that a "reasonable agent in [defendant's] position would have known . . . that to place and keep [plaintiff] in handcuffs [for thirty minutes] that were so tight that they caused her unnecessary pain [and some alleged bruising] violated her Fourth Amendment right to be free from unreasonable seizure," thus summary judgment on qualified immunity grounds was not warranted).

*Eklund v. Cnty. of Orange*, No. SACV 08-0099 DOC (RNBx), 2009 WL 10670621, at *5 (C.D. Cal. May 11, 2009). That caselaw confirms we must go to trial for at some defendants.

*As to Officer Marques*: He and Officer Riosbaas first handcuffed Donahue, so deserves mention here. But Donahue's operative complaint did not allege claims against him. Donahue's operative complaint focused on the prolonged handcuffing and the failure to respond to complaints the handcuffs were tight (more on this point below).

*As to Officer Riosbaas*: Parties do not disagree that Officer Riosbaas heard Donahue complain multiple times before the handcuffs were checked. But a jury question remains as to whether his decision to do nothing (it seems), was reasonable. He must stand trial to get to this truth because — construing the facts in favor of Donahue and comparing it to the caselaw — he is not entitled to qualified immunity. A reasonable officer in his position was on notice that ignoring repeated complaints constituted excessive force.

*As to Supervising Officer Evans*: He attested the one complaint he heard was enough for him to refer it to someone else to act. Did he? One of the persons he said he might inform (based on role) was Officer Riosbaas. For this and other reasons, there is a jury question about how much he knew and what he did. Recall Donahue remained handcuffed for another 30

34

1    minutes or so.  He must stand trial to get to this truth because he, too, is not entitled to

2    qualified immunity under our caselaw and these circumstances.

3         *As to Officer Nieves*:  He is by contrast entitled to summary judgment.  *Respecting the*

4    *time handcuffed in the first set*, there is insufficient evidence to support that he integrally

5    participated in any violation.  *Respecting the exchange of handcuffs*, he is entitled to qualified

6    immunity.  Perhaps a jury could find, as Donahue alleged, that Officer Nieves's choice to

7    exchange cuffs by first placing a second pair on the same wrists before removing the first

8    constituted excessive force — or that it did in this specific context.  Perhaps not.  Regardless, a

9    reasonable officer in Officer Nieves's position was not on notice that an up to two-minute

10   process of exchanging handcuffs with another pair — and with no clear intent to injure —

11   could violate the constitution.  *And, respecting handcuffing during the final transport to jail*,

12   Donahue did not proffer sufficient evidence of that scenario to show any clearly established

13   violation.  For similar reasons, *Officer Geis* is also entitled to qualified immunity even

14   assuming he integrally participated in Officer Nieves's handcuff exchange.

15        That said, this does not mean that any pain or injury that crystalized during the handcuff

16   exchange is irrelevant to what remains for trial.  Such injury may have relevance to liability

17   and damages.  But that depends and it need not be decided now.  Same goes for the relevance

18   of issues closer to the outset of our story under *Graham* (why handcuffed, where located, etc.).

19        *As to the City of Antioch*:  It is entitled to summary judgment on this claim.  There is no

20   record evidence of a policy, pattern or practice sanctioning any conduct at issue.  *See Monell v.*

21   *Dep't of Soc. Servs.*, 436 U.S. 658, 694–95 (1978).

22        As a result, summary judgment on the claim for excessive force related to Donahue's

23   handcuffing ("COUNT 11") is **GRANTED** in favor of Officer Nieves and the City of Antioch,

24   but otherwise **DENIED.**  This claim must go to trial as against Officer Riosbaas and Supervising

25   Officer Evans.

26

27

28

United States District Court
Northern District of California

35

### E. THE SEIZURE AND FAILURE TO RETURN THE PHONE: FOURTH AND FOURTEENTH AMENDMENTS ("COUNT 6").

#### (i) Fourth Amendment.

At trial, under the Fourth Amendment, Donahue must prove the government actor in dispossessing him of his iPhone did more "than they were entitled to do incident to the usual custodial arrest." *United States v. Edwards*, 415 U.S. 800, 805 (1974). And, in attributing liability for that action to the government agency, he must overcome *Monell*.

Here, Donahue's operative complaint failed to bring a claim against the person who by later admission took his iPhone, Officer Marques. But Donahue did allege that the City of Antioch was liable for the actions of that officer, much as the City would still be liable if the officer were entitled to qualified immunity from which the City could not benefit.

Recall the circumstances construed for Donahue — detailed in this order's statement.

Reacting to those circumstances, the City of Antioch first argues that if "officers had [intentionally and] maliciously confiscated Plaintiff's property, they would have arguably 'disappeared' other belongings as well" (Br. 16). Maybe, maybe not. The word "arguably" underscores that facts must be found by a jury before it can be determined whether any such dispossession exceeded the scope of any reasonable seizure under the Fourth Amendment.

Moreover, given the attestations by an officer and a supervising officer that placing arrestees' effects on the roofs of vehicles is routine in the Antioch Police Department, there is at least a jury question as to whether a pattern or practice or "policy of inaction" was in place with respect to losing or destroying arrestees' property during the course of an arrest, including phones or other effects with potential evidentiary value for the arrestee. Related issues are addressed below with respect to the Fourteenth Amendment-styled analogue.

Donahue did bring the claim against other individual officers, most of whom arrived after the phone was put on the SUV. But this claim is not sustained against the individuals here ultimately for reasons set out below for the Fourteenth Amendment-styled claim.

As a result, summary judgment on the claim for the Fourth Amendment seizure of the iPhone is ("COUNT 6")— as to the City of Antioch — **DENIED.** This claim must go to trial.

1

### (ii)    *Fourteenth Amendment.*

2      At trial, under the Fourteenth Amendment, Donahue must prove that the government

3  dispossessed him of his iPhone without due process.  *See Haygood v. Younger*, 769 F.2d 1350,

4  1357 (9th Cir. 1985).

5      In seeking summary judgment, the City of Antioch contends adequate process was

6  provided post-deprivation (City Br. 17).  It cites a line of cases, primarily from the prison

7  context, holding that the negligent or even intentional deprivation of a person's property by a

8  state actor before process does not offend the Fourteenth Amendment if the state comes up

9  with a remedy afterwards.  *E.g.*, *Hudson v. Palmer*, 468 U.S. 517, 539 (1984) (O'Connor, J.,

10  concurring).  The thrust of these cases is pragmatic, as they limit a result where every tort-like

11  claim against an individual state actor demands extensive review under the federal Fourteenth

12  Amendment.  *Albright v. Oliver*, 510 U.S. 266, 284 (1994) (Kennedy, J., concurring).  Even if

13  line of cases controls, however, that line has a limiting principle.  It applies to "a state actor's

14  random and unauthorized deprivation" of the interest.  *Ibid.*

15      "[W]here the injury is [instead] the product of the operation of state law, regulation, or

16  institutionalized practice, it is neither random nor unauthorized, but wholly predictable,

17  authorized, and within the power of the state to control."  *Haygood*, 769 F.2d at 1357.  In

18  pattern or practice cases, for example, "the state has forfeited its opportunity under its

19  procedures to provide an appropriate remedy for wrongs having the state's own imprimatur.  In

20  terms of the Constitution, the existence of the unconstitutional state policy prevents the citizen

21  from receiving 'due process of law,' regardless of the purity of the procedures themselves."

22  *Mann v. City of Tucson*, 782 F.2d 790, 798 (9th Cir. 1986) (Sneed, J., concurring).  The

23  Fourteenth Amendment thus reasserts itself to query whether further process was due

24  beforehand.  *Albright*, 510 U.S. at 284 (Kennedy, J., concurring).  Not all deprivations permit

25  notice and an opportunity to be heard, of course.  But some "substitute procedural safeguards"

26  may be required to limit "the risk of an erroneous deprivation" of property according to the

27  foreseeable "time, place, and circumstances."  *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976).

28

United States District Court
Northern District of California

1    Here, a reasonable jury could find for Donahue that the loss or destruction of his iPhone

2    was not negligent, nor even random.  As set out above, Officer Marques and Supervising

3    Officer Evans themselves attested that the kind of dispossession that occurred here resulted

4    from a set of practices that are routine.  That attestation does not clear the air.  A jury could go

5    either way as to whether the set of common practices here was, in brief, the problem.

6        As a result, summary judgment on the claim for the seizure and failure to return

7    Donahue's cell phone without due process ("COUNT 6") is **GRANTED** in favor of all

8    individual defendants, but — as to the City of Antioch — **DENIED.**  This issue must go to trial.

9              ***F.    THE SEARCH OF THE CAR: FOURTH AMENDMENT ("COUNT 9").***

10    Defendants also concede Donahue's vehicle was searched without a warrant.  Again, at

11    trial, defendants must prove the search fell within an exception to the Fourth Amendment's

12    warrant requirement.  Defendants proffer only that the search was an inventory search.  "Once

13    a vehicle has been legally impounded, the police may conduct an inventory search, as long as it

14    conforms to the standard procedures of the local police department.  However, an inventory

15    search must not be a ruse for a general rummaging in order to discover incriminating

16    evidence."  *United States v. Cervantes*, 703 F.3d 1135, 1141 (9th Cir. 2012).

17        Here, the record supports the officers followed the department's policy and completed an

18    inventory sheet noting the firearm and condition of the vehicle — contrary to Donahue's

19    argument.  True, an air mattress in the trunk was not inventoried.  But such a failure is not

20    material to the conclusion the search was an inventory.  *United States v. Garay*, 938 F.3d 1108,

21    1112 (9th Cir. 2019).

22        Donahue also complains that officers began to search even before the decision to tow.

23    But the recorded videos contradict that contention, as set out above.  Some officers looked to

24    see what was in plain view through the open window and door.  But peering at what is already

25    in plain view is not a search within the meaning of the Fourth Amendment.

26        As a result, summary judgment on the claim for the search or inventory of Donahue's

27    vehicle ("COUNT 9") is — in favor of defendants and against plaintiff — **GRANTED**.

28

*United States District Court*
*Northern District of California*

### G.    THE SEIZURE AND FAILURE TO RETURN THE CAR: FOURTH AND FOURTEENTH AMENDMENTS ("COUNT 15").

Donahue alleged his vehicle was (i) impounded despite the availability of a third party to pick it up, and (ii) not released to him after he was released from jail and sought its release.

#### (i)    The Initial Impoundment.

Defendants concede Donahue's vehicle was seized without a warrant.  At trial, defendants must prove the seizure fell within an exception to the Fourth Amendment's warrant requirement.  *Cervantes*, 703 F.3d at 1140–42.  Recall we said with respect to the prolonged stop there was a basis for arresting Donahue.  Was there also a basis for seizing his vehicle?

In seeking summary judgment, defendants first assert a state statute.  But "the decision to impound pursuant to the authority of a city ordinance and state statute does not, in and of itself, determine the reasonableness of the seizure."  *Id.* at 1142 (quotation omitted).

Turning to the community caretaking rationale that controls, defendants first explain why Donahue would be removed (addressed below), and so then why his car needed to be removed, too.  There, they present some evidence.  Records kept in the course of business show vehicle theft and break-ins occurring around Vista Grande Drive and Deerspring Way (Koch Decl. Exh. A).  Officer Riosbaas attests this was the basis of his decision to impound the vehicle (¶¶ 36–27).  Donahue does not present contrary evidence.  Defendants prevail.

Donahue first argues that he was coerced into signing a citation for reckless driving.  But defendants do not rely on that purportedly signed citation in explaining why the constitution permitted them to tow the vehicle in these circumstances — nor does this order.  A simpler reason also present here was that the officer would not let Donahue drive an unregistered vehicle without a driver's license, prompting the need to remove the vehicle until retrieved.

Donahue next argues that defendants should have allowed his father to retrieve the vehicle roadside, as captured on videos.  Yes, "impounding the automobile without regard to whether the defendant can provide for its removal is patently unreasonable if the ostensible purpose for the impoundment is for the 'caretaking' of the streets.'"  *Miranda v. City of Cornelius*, 429 F.3d 858, 865 (9th Cir. 2005).  But, even construing the circumstances to favor Donahue, no reasonable jury could conclude that Officer Riosbaas failed to consider the

waiting for a third party. Indeed, he asked Donahue if someone could pick up the car. Then he asked whether "they're going to have a valid driver's license." Donahue said, "Yeah, I have a valid passport" (18:14:20). If the community caretaking function so requires, it was not clearly established at the time of the conduct that Officer Riosbaas was required to wait for a person he reasonably believed would have no better authorization to drive than Donahue.

As to the City, no policy, pattern, or practice links it to any violation here. *Id.* at 869.

As a result, summary judgment on the claim for the seizure of Donahue's vehicle is — in favor of all defendants and against Donahue — **GRANTED.**

### *(ii)    The Failure to Return.*

Donahue previously maintained a claim for both the initial seizure and then the continued seizure and refusal to return his vehicle. *See Sandoval v. Cnty. of Sonoma*, 912 F.3d 509, 516 (9th Cir. 2018). Somewhere in his summary judgment papers and our docket, Donahue may have attached documents related to an effort to release his car. But in his legal argument, he has not advanced this issue at all. He has not proffered any explanation or citation about, for instance, what effort if any he made to secure the return of his vehicle, what response if any he received, and why that was inadequate under the constitution (*e.g.*, Donahue Br. 37–38).

Meanwhile, the other side moves for summary judgment, and in short says the reason for continued deprivation was that he had not cured his license and registration nor proposed an alternative way to remove the vehicle (*see* City Br. 16). (Donahue did not oppose this, either.)

As a result, summary judgment on the claim for the failure to return Donahue's vehicle is ("COUNT 15") — in favor of all defendants and against Donahue — **GRANTED.**

### H.    EVIDENCE FABRICATION: FOURTEENTH AMENDMENT ("COUNT 3").

At trial, Donahue must prove that (1) the officers deliberately fabricated evidence and that (2) this fabrication actually and proximately caused the plaintiff's deprivation. *Spencer v. Peters*, 857 F.3d 789, 798 (9th Cir. 2017). Qualified immunity provides little refuge for such violations. *See id.* at 800 (quotation omitted).

Donahue's theory in essence is that Officer Riosbaas cooked up the reckless driving charge to initiate the impoundment of the Kia and an inventory search — and everything that followed for him was a foreseeable and unfair consequence.

But Donahue fails on the "but for" cause prong. If Donahue in fact had signaled every lane change, driven always below the limit, and possessed a valid license and registration, such that a false accusation he had been driving recklessly was the only reason he was stopped, his vehicle impounded and inventoried, and his unlawful firearm found — we might have a different case. So too if the firearm had been planted. But no reasonable jury could conclude that is our case. Recall the video showed Donahue had not signaled every lane change. That was enough to stop Donahue, even pretextually. Officer Riosbaas then quickly developed probable cause the license plate was invalid (and soon that the registration was over six months expired). And, he grew concerned for safety. That was enough to detain Donahue, impound the vehicle under California Vehicle Code Section 22651(o) and the community caretaking standards (above), and thus perform the inventory that turned up the firearm and put Donahue in jail. Officer Riosbaas did not have "license to deliberately manufacture false evidence." *Spencer*, 857 F.3d at 800. But, here, he did not have to — and if he did, it did not make the kind of difference that our caselaw requires for it to have been actionable.

As a result, summary judgment on the claim for evidence fabrication ("COUNT 3") is — in favor of all defendants and against Donahue — **GRANTED.**

## I.    EVIDENCE SUPPRESSION: FOURTEENTH AMENDMENT ("COUNT 4").

Donahue's operative complaint also alleged the officers or prosecutor suppressed evidence. Much as just described, Donahue again fails to show how he was harmed. *Cf. Mellen v. Winn*, 900 F.3d 1085, 1096 (9th Cir. 2018). The gist of Donahue's theories is that officers might have had reasons to turn off body-worn cameras, or that the City of Antioch might have allayed problems had it watched such recordings more regularly (*e.g.*, Donahue Br. 41–42, 47–48). Perhaps so. Perhaps not. But no evidence comes close to making it plausible.

United States District Court
Northern District of California

1    As a result, summary judgment on the claim for evidence suppression ("COUNT 4")

2    is — in favor of all defendants and against Donahue — **GRANTED.**

3         **J.    MALICIOUS POLICING OR RETALIATORY ARREST:  FIRST
             AND FOURTH AMENDMENT ("COUNT 16").**

4         Donahue also alleged the officers did the above maliciously, with retaliatory animus, or

5    otherwise as part of a conspiracy to deprive his rights.

6         *As a Fourth Amendment claim of malicious policing or prosecution,* Donahue must prove

7    at trial that police or prosecutors maliciously pursued him knowingly without probable cause to

8    deny him equal protection or another right and that any charges against him terminated in his

9    favor.  *See Thompson v. Clark*, 596 U.S. 36, 43–44 (2022); *Mills v. City of Covina*, 921 F.3d

10   1161, 1168 (9th Cir. 2019).  Here, construed to favor Donahue, the circumstances nevertheless

11   provided officers reasonable suspicion to make the stop, then probable cause to arrest him.

12        *Alternatively, as a First Amendment claim of retaliatory arrest*, Donahue must prove at

13   trial that police were animated to arrest him because of his disfavored political views.

14   *Ballentine v. Tucker*, 28 F.4th 54, 62 (9th Cir. 2022) (applying *Nieves v. Bartlett*, 587 U.S. 391,

15   406–08 (2019)).  A complaint must allege *either* that there was no probable cause for the

16   arrest, *or* that there was probable cause but that officers typically use discretion not to arrest

17   persons in such situations.  *Ibid.*; *Gonzalez v. Trevino*, 602 U.S. 653, 655 (2024) (per curiam).

18   Here, Donahue failed to mount evidence that no officer could believe he was speeding

19   (probable cause), nor that officers would disproportionately let other speeders go, for instance

20   (atypical discretion).  *See Ballentine*, 28 F.4th at 62.  Donahue also does not point to

21   admissible evidence that the officers knew of his beliefs before he was stopped.  And, he fails

22   to consider how circumstances that developed during the stop unrelated to his purported views

23   — such as the failure to stop on Vista Grande, the tinted windows, the fact the back windows

24   did not roll down, the failure to immediately exit the car, and so on — and whether officers

25   facing those circumstances absent his views would behave similarly.

26        *Finally, if construed as alleging a conspiracy to arrest Donahue on false pretenses*, the

27   claim fails for the reasons the individualized claims fail.  And, if construed under Section 1985,

28

it fails also because the allegations do not identify a protected racial or class-based group. *See Sever v. Alaska Pulp Corp.*, 978 F.2d 1529, 1536 (9th Cir. 1992). Donahue did not allege that his race was a factor in the stop or events (*e.g.*, Supp. 7). He cannot now offer that claim on summary judgment (*e.g.*, Donahue Mem. 30–31).

(To be clear: Donahue newly asserts racial bias, but these allegations were not present in the complaint nor in the first, second, nor third amended complaint, and so are ignored.)

As a result, summary judgment on the claim for malicious policing or retaliatory arrest ("COUNT 16") — in favor of all defendants and against Donahue — is **GRANTED.**

### 2.   THE EVENTS RELATED TO THE COUNTY AND THE PROSECUTOR.

#### A.   *JAILING WITHOUT TIMELY, JUDICIALLY DETERMINED PROBABLE CAUSE: FOURTH AMENDMENT ("COUNT 8").*

At trial, Donahue must show his detention in the jail was unreasonable. *See Gerstein v. Pugh*, 420 U.S. 103, 114 (1975). "Where an arrested individual he did "not receive a probable cause determination [by a judge] within 48 hours," irrespective of weekends, the pretrial detention "is presumptively unreasonable." *Cnty. of Riverside v. McLaughlin*, 500 U.S. 44, 57 (1991). Probable cause must be decided by a judge. *Gerstein*, 420 U.S. at 114, 123.

Even construed in favor of Donahue, the record evidence establishes that Donahue was arrested Friday evening no earlier than 5:42 p.m., that Officer Nieves later submitted a probable cause declaration containing a statement from Officer Riosbaas, and that Superior Court Judge Brian Haynes approved it no later than 2:18 a.m. Saturday morning (the same night). A declaration states how the Superior Court's computer system works so that judges can sign approval of probable cause declarations, and how this in fact occurred here.

Donahue's contrary assertions are unsupported. This Court's prior concern about this system was that there was no way to know who had approved the order. Now there is. Donahue next raises that the judge appears to have approved the probable cause declaration, then to have read it. But this order credits the County's argument that the constitutional standard would be unworkable if it entailed the County second-guessing every judicial approval, as Donahue invites. Donahue does not provide evidence of any systemic problems.

Thus, Donahue's detention was reasonable under *Riverside v. McLaughlin*.

As a result, summary judgment on the claim for jailing without timely, judicially determined probable cause is ("COUNT 8") — in favor of all defendants and against Donahue — **GRANTED.**

### B.    JAILING WITHOUT TIMELY ARRAIGNMENT:  FOURTH AND FOURTEENTH AMENDMENT ("COUNT 13").

Donahue further seeks to show he was held improperly without being timely arraigned by a magistrate.  There are two ways this claim could apply, and neither does.

*First*, "pretrial detention can violate the Fourth Amendment not only when it precedes, but also when it follows, the start of legal process." *Manuel v. City of Joliet*, 580 U.S. 357, 367 (2017).  An example of "legal process itself go[ing] wrong" is when "a judge's probable-cause determination is predicated solely on a police officer's false statements." *Ibid.*

Here, Donahue contends Officer Nieves's report contained false statements, including as to speed.  But Donahue does not provide record evidence that the judge's determination was reasonably "predicated solely" on such statements.  As set out above, the declaration submitted to the judge included multiple felonies related to the firearm found in Donahue's vehicle.  He does not refute those as baseless, just contends they came about only because of the reckless driving charge.  But we already saw that was not so when discussing the but-for cause issues.

*Second*, if the initial legal process goes right, pretrial detention can violate the Fourteenth Amendment when a party is detained too long.  *See, e.g.*, *Oviatt v. Pearce*, 954 F.2d 1470, 1474–75 (9th Cir. 1992).  For instance, a federal due process claim can arise where a state law specifies a time by which arraignment must occur, yet a person is held longer without.  *See ibid.*  Under California Penal Code Section 825(a), "the defendant shall in all cases be taken before the magistrate without unnecessary delay, and, in any event, within 48 hours after his or her arrest, excluding Sundays and holidays."  And, if the time above is set to "expire at a time when the court in which the magistrate is sitting is not in session, that time shall be extended to include the duration of the next court session on the judicial day immediately following." *id.*

(a)(2).  California appellate caselaw accepts that both "Saturday and Sunday are judicial holidays."  *E.g.*, *Youngblood v. Gates*, 246 Cal. Rptr. 775, 782 n.5 (Ct. App. 1988).

Here, it is undisputed that Donahue was arrested Friday, January 6, 2023, no earlier than 5:42 p.m.  Applying the rule above, the first 24-hour period would expire not on Saturday, not on Sunday, but on Monday at 5:42 p.m.  And, the next 24-hour period would expire on Tuesday at 5:42 p.m. — but because that time is after hours, the time to complete arraignment would extend to close of business the next day, Wednesday (*see* Hurley Decl. Exhs. E, I).  It is undisputed Donahue was arraigned that Wednesday, January 11, 2023 at 1:35 p.m. (Exh. P).

Donahue does not present any other record evidence supporting an alternative basis for finding that his arraignment was unnecessarily delayed by the County.

As a result, summary judgment on the claim for jailing without timely arraignment is ("COUNT 13") — in favor of all defendants and against Donahue — **GRANTED.**

### C.    PROSECUTOR CONDUCT:  FOURTEENTH AMENDMENT ("COUNT 2" AND "5").

Donahue alleged the prosecutor on his state criminal proceeding did not tell him until a day before an officer's expected testimony that the officer was subject to discipline by the department.  This allegedly prejudiced Donahue's ability to impeach the witness, violating his Fourth and Fourteenth Amendment rights.  Notably, Donahue seeks only damages.

A prosecutor is entitled to absolute immunity from civil damages for actions that are prosecutorial in function.  *Broam v. Bogan*, 320 F.3d 1023, 1030 (9th Cir. 2003).  "A prosecutor's decision not to preserve or turn over exculpatory material," like the witness list or impeachment information, is such an act.  *See ibid.*  A county is likewise entitled to immunity when the prosecutor acts, as on the facts alleged here, as a "state officer."  *Cf. Weiner v. San Diego Cnty.*, 210 F.3d 1025, 1031 (9th Cir. 2000); *Goldstein v. City of Long Beach*, 715 F.3d 750, 761 (9th Cir. 2013) (not disturbing *Pitts v. Cnty. of Kern*, 949 P.2d 920, 923 (Cal. 1998)).

Here, there is no material dispute that Prosecutor Heather Turner (and others on her team) were acting in prosecutorial function.  Moreover, Prosecutor Turner attests that she followed her office's policy.  She checked to see if witnesses she would call were subject to

discipline.  But when she found that Officer Evans was such an officer, she also found that all his personnel files from the disciplinary process remained privileged — so she withdrew him as a witness (¶¶ 7–9).  This sequence is classically prosecutorial in nature.  She is entitled to immunity as a matter of law.  So is the County.

As a result, summary judgment on the claim about the prosecutor's conduct is ("COUNT 2" and "5") — in favor of all defendants and against Donahue — **GRANTED.**

## CONCLUSION

Summary judgment is granted in favor of all defendants on all issues, except that it is denied as to the City of Antioch for the claims regarding the disappeared iPhone ("COUNT 6"), and denied as to Officer Riosbaas and Supervising Officer Evans for the handcuffing ("COUNT 11").  Those claims must go to trial.

Dated:  April 24, 2025.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE