1

2

3

4

5

6

7                           UNITED STATES DISTRICT COURT

8                        NORTHERN DISTRICT OF CALIFORNIA

9

10      KING DAVID LEVON DONAHUE III,

11              Plaintiff,                              No.  C 23-05564 WHA

12          v.

13      CITY OF ANTIOCH, SUPERVISING              **ORDER SETTING FORTH**
        OFFICER JOSHUA EVANS, and                **FINDINGS OF FACT AND**
14      OFFICER JOSHUA RIOSBAAS,                  **CONCLUSIONS OF LAW**

15              Defendants.

16      _____

17          *Pro se* plaintiff King David Levon Donahue III brought this Section 1983 action against

18      the City of Antioch, Supervising Officer Joshua Evans, and Officer Joshua Riosbaas, among

19      others, for alleged constitutional violations stemming from a traffic stop.  All claims were

20      dismissed on summary judgment except for the two claims addressed herein.  All remaining

21      parties then agreed to proceed by bench trial (Dkt. No. 192-1), which was held for three days.

22      Donahue did not obtain counsel.  Our district court's pro bono project office could not

23      accommodate plaintiff (despite effort).  At trial, he acted as his own lawyer.

24                                   **FINDINGS OF FACT**

25          Although summary judgment held that the initial stop was lawful, the facts of the initial

26      stop bear on the decision to handcuff Donahue and to keep him handcuffed, so they are set out

27      here for the benefit of the court of appeals.  This order does not address Donahue's removal

28      from his car, any item discovered inside his car, his car's search and impoundment, his

United States District Court
Northern District of California

subsequent time in jail, nor anything else not relevant to the issues at trial. Those issues were dismissed on summary judgment. Unless otherwise noted, all citations are to the timestamp on defendants' Trial Exhibit 8. Almost every finding herein is based on that exhibit, a synced composite of dashcam and/or body-worn camera footage.

**1.    THE INITIAL STOP.**

1.    All events in question occurred on January 6, 2023 in Antioch, California.

2.    That evening, Officer Riosbaas was an on-duty employee of the Antioch Police Department of the City of Antioch. He was six weeks into his job as a solo patrolman. This night, however, he was traveling with and responsible for a cadet, a young person training to become a police officer who sat in the front passenger seat with him. Throughout all events in question, all officers were courteous and professional in what they said to Donahue.

3.    At about 5:40 p.m., Officer Riosbaas was driving eastbound on Lone Tree Way to respond to a call with his cadet when he was stopped by a red light at the intersection with Deer Valley Road. He heard the rev of an engine out of view. Then, as the light changed to green, he saw a car with tinted windows accelerate through the intersection. (The officer had been in the far-left lane of the three eastbound lanes; the speeding car emerged from the far-right lane.)

4.    Officer Riosbaas sped to catch up. He surpassed 65 miles per hour to do so where the speed limit was 45 miles per hour. As the car shifted lanes through slower-moving traffic, Officer Riosbaas slowed his pursuit to avoid the traffic.

5.    Officer Riosbaas then sped a second time to catch up — again surpassing 65 miles per hour to do so. He activated his dash camera during this second pursuit, and it remained recording from then on. As Officer Riosbaas approached the car, it braked — its brake lights remaining on for nine seconds. After the brake lights went off, the car shifted into the left lane without signaling. By the time Officer Riosbaas reached the car, it had reduced its speed back to 45 miles per hour and was nearing the intersection with Hillcrest Avenue.

6.    Just before 5:42 p.m., Officer Riosbaas turned on his police siren and lights — "preempting off" his service call to initiate this traffic stop.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

7.    Donahue was driving the car.  He heard the siren, saw the lights, and recognized that he needed to pull over for the police vehicle.  He signaled and changed into the right-most lane but continued eastbound on Lone Tree Way without stopping because there was no shoulder and it was a red zone.

8.    Officer Riosbaas further closed the distance to the car.  For the first time, he could see the car's license plate clearly, which was yellow and looked like a "paper plate" rather than a permanent license plate.  He asked dispatch to check the license plate's number:  UCC 1-308.  He did not yet recognize that the license plate was a privately made plate that referenced the Uniform Commercial Code's section on reservation of rights.

9.    At the next intersection, Donahue turned right and continued southbound down Vista Grande Drive again without stopping.  That road had a bike lane instead of a shoulder but the bike lane was not being used at that time.  Now, Officer Riosbaas called into the dispatch that the car was "not yielding yet" (17:42:34).  Seconds later, at the next intersection, the car turned right and stopped on Deerspring Way.

10.    Just before 5:43 p.m., one minute after the first yip of the siren, Donahue came to a stop.  Dispatch then reported that the license plate was not listed in any database.  Indeed, Officer Riosbaas now recognized that the yellow paper plate was not DMV-issued at all.  He did not know whether the vehicle was stolen.  And, because the car's windows were darkly tinted and he had not yet turned on the police vehicle's spotlights, he "c[ould ]not see inside the vehicle" well enough to feel safe approaching the car without backup.  The new officer and the trainee strained to see what was inside.  Each thought they might have seen something move.  They reported movements from the vehicle to dispatch to ensure backup arrived.

11.    At 5:43 p.m., immediately after the report of movements inside the vehicle, dispatch directed backup units to the scene.  Also by radio and still somewhere else himself, the supervisor of Officer Riosbaas — meaning Supervising Officer Evans — ordered a "code 33" (Tr. 217).  This halted other radio traffic and directed more units to the scene.

12.    Between 5:43 p.m. and 5:44 p.m., Officer Riosbaas repeatedly ordered the car's driver to roll down all four windows.  The car's driver (Donahue) did not immediately do so,

3

and never rolled down the rear windows.  Officer Riosbaas also repeatedly ordered the car's driver to turn off the car's engine, and again the car's driver did not immediately do so.  And, through the driver's window, the driver (Donahue) yelled "I'm not under your jurisdiction."

13.    All of this — the fabricated license plate, the failure to comply with orders, and this exclamation — made Officer Riosbaas now believe that the driver was a "sovereign citizen."  His training had taught him that sovereign citizens do not respect authority and can respond violently.  He reported to dispatch that the driver was not following orders and was a "sovereign citizen."  (Donahue, it turns out, was a "state national."  But Officer Riosbaas had no reason to know Donahue's exact affiliation at the time he made his report to dispatch.)

14.    At about 5:52 p.m., Officer Shawn Marques arrived as backup.  He, too, was an on-duty employee of the Antioch Police Department.  (Officer Marques was dismissed as a defendant at summary judgment but at trial testified to the handcuffing and iPhone loss that remained at issue.)

15.    Officer Riosbaas asked Officer Marques how he thought they should approach the situation.  Officer Marques advised that they should ask the car's driver to exit the vehicle and walk towards them to limit risk from any unknown dangers in the vehicle.  They took up a position in the street and behind the police vehicle's open driver's door.

16.    At 5:53 p.m., Officer Riosbaas for the very first time ordered the driver to step out of the vehicle with his hands up.  The driver did not step out of the vehicle, which Officer Riosbaas told dispatch.  At 5:54 p.m., for a second time, Officer Riosbaas ordered the driver to step out.  The officers heard the car's driver say "What?!"

17.    By this point, another officer had arrived (not identified by name in our trial record).  His distinct, louder voice — distinct from Officer Riosbaas and from Officer Marques — now yelled back:  "We don't want this to escalate any further, man.  Just step on out and talk to us, please.  Keep your hands up.  Keep your hands up, please.  We're not gonna shoot you as long as your hands are up.  Keep your hands up" (17:54:20).

4

18.     The driver stepped out with hands up, saying, "You're violating my rights."  In one hand, he held his "passport card."  In the other, he held a white iPhone recording the encounter.

19.     The distinct, louder voice now said, "Go ahead and 10-15," and Officer Riosbaas and Officer Marques emerged from the passenger side of the police vehicle to approach Donahue.  And, after they reached Donahue, the source of that voice — a third officer — emerged from the driver side of the police vehicle to approach Donahue.  His weapon was drawn and pointed to the ground.  (Ultimately, a total of eight officers plus the training cadet arrived on the scene.)

20.     Donahue still held his passport card in one hand, and white iPhone in the other.

**2.      THE HANDCUFFING.**

   *A.      DONAHUE'S HANDCUFFS LOCKED.*

21.     At about 5:55 p.m., Officers Riosbaas handcuffed Donahue (17:54:54).  Officer Riosbaas secured Donahue's hands behind his back using a single set of handcuffs, with Officer Marques steadying Donahue's hands.  Donahue did not resist.  The officers did not pat down Donahue, and did not ask for his wallet to obtain any other identification or insurance information.  (Later, 23 minutes into the traffic stop, Officer Riosbaas asked to see Donahue's insurance information and wallet.)

22.     Donahue felt that the handcuffs "were tight from the beginning."  He did not make any verbal or non-verbal expressions of discomfort at that time.

23.     Officer Riosbaas led Donahue to the back of Officer Riosbaas's police vehicle, placed him in the back seat, and closed the door, with Donahue's hands still behind his back.  Donahue was six feet, two inches tall and built like a large fireplug with comparatively short arms.  He sat with his legs splayed out and leaning forward slightly to make room for his arms, which were pulled hard behind his back.

24.     In front of the police vehicle, Officer Riosbaas, Officer Marques, the training cadet, and three other officers could be seen.  Officer Marques and another officer found the VIN on Donahue's car and read it to dispatch.  Officer Riosbaas pointed his flashlight into the

United States District Court
Northern District of California

open driver's door, and later into the passenger windows.  He then read Donahue's name from Donahue's passport card to dispatch.

25.    As a result, within the first four minutes of handcuffing, Officer Riosbaas had determined through dispatch that:

> (1) the car's license plates were not registered to any car;
>
> (2) the car's registration to proper plates had expired, with this registration having been in Donahue's name;
>
> (3) Donahue's driver's license had expired; and,
>
> (4) Donahue's name was associated with an "AFS" record, or Automated Firearm System, this information volunteered by dispatch.

At the conclusion of this inquiry, the officers stood in front of the police car.  They performed no further visible activity.  They stated nothing audible in our record.  They were idle — not directing traffic, not securing evidence.  Officer Riosbaas took off his jacket, walked back to his police vehicle, opened the front passenger door, and put it inside — whereupon Donahue told him "All you gotta do is run that card!" (17:58:40).  Officer Riosbaas closed the door and went back to the officers.  More time passed with no activity.

26.    During those minutes, Donahue sat alone in the back of the police vehicle with its windows rolled up.  He initially complained out loud to himself that he had been stopped and that the officers were peering through his car's windows — but he did not yet complain to himself about the handcuffs.  Soon, however, he started to "really feel the pain" (Tr. 109).

### B.    DONAHUE'S COMPLAINTS TO HIMSELF.

27.    At about 5:59 p.m., or four to five minutes into handcuffing, Donahue complained about the handcuffs for the first time to himself.  He said, "Motherfucking cuffs off me" (17:59:17).  (This and other comments he made to himself were picked up by video and audio recorded inside the police vehicle.)

28.    At 6:00 p.m., or five minutes into his handcuffing, Donahue complained about the handcuffs for a second time to himself.  He said, "They put these motherfuckers on hella tight."  No one could hear him.

29.     That same minute, Officer Riosbaas then entered the front of the police vehicle. Donahue asked him to run his passport card.  If Officer Riosbaas did so, said Donahue, he would realize Donahue was listed as "do not detain" and would let him go.  Officer Riosbaas asked Donahue in turn what his address was, and Donahue did not answer.  Then Officer Riosbaas said, referring to an address he had found otherwise, "2420 Sand Creek; that'll work?"  Donahue did not complain about the handcuffs during this initial interaction.  Officer Riosbaas left the car and shut the door.

30.     Officer Riosbaas returned to the four other officers and the training cadet standing idle in front of Officer Riosbaas's police vehicle.  Donahue said out loud to himself, "This shit crazy, bro.  Violating my rights."

31.     At about 6:01 p.m., Officer Riosbaas reopened the door of the police vehicle.  He and Donahue initially sat together in silence.

### C.     DONAHUE'S FIRST COMPLAINT TO OFFICER RIOSBAAS.

32.     At about 6:02 p.m., or seven minutes into his handcuffing, Donahue complained about the handcuffs for the first time to Officer Riosbaas.  He said, "Man these cuffs are super tight."  Officer Riosbaas heard the complaint, but did not respond nor act to investigate or relieve the tightness (18:01:57).

33.     Nothing else was said for thirty seconds.  Then, Officer Riosbaas began asking Donahue how fast he had been driving, and Donahue said he had not been speeding and had not broken any laws.  Nothing more was said between them during this interaction.  About two minutes later, Officer Riosbaas left the vehicle and closed the door (18:04:27).

34.     Meanwhile, several of the officers who had been standing in front of the police vehicle had gone out of view of the dash camera.  But one officer remained standing on the sidewalk, looking at his phone, smiling.  After Officer Riosbaas closed the door, he joined the smiling officer.  Donahue, now alone in the car, said, "This is crazy bro, it's like, you know you've seen it, um, and all you playing games, pshh."  The officers stood outside on the sidewalk.  Donahue, still alone, said, "I'm not trying to be an asshole, man.  Holding me longer than what I need to be, man, this is crazy."

United States District Court
Northern District of California

35.     At about 6:05 p.m., or ten minutes into his handcuffing, Donahue complained about the handcuffs for a third time to himself.  "Wow.  And you're going to put the cuffs on me super tight" (18:05:18).

36.     About thirty seconds after complaining to himself about the handcuffs, Donahue said, "I need to talk to your supervisor!  Where's your supervisor."  He raised his voice to try to be heard through the windows (18:05:45).

37.     Officer Riosbaas, Officer Marques, two other officers, and the training cadet again convened in front of the police vehicle.  Then, Officer Riosbaas reentered the police vehicle.

38.     Donahue said:  "I need to talk to a supervisor.  Is your supervisor here?" (18:06:36).  Officer Riosbaas said, "Yes."  At that moment, two officers were yet again peering inside Donahue's vehicle.

### D.     DONAHUE'S SECOND COMPLAINT TO OFFICER RIOSBAAS.

39.     At about 6:07 p.m., or almost twelve minutes into his handcuffing, Donahue complained about the handcuffs for the second time to Officer Riosbaas.  Donahue said, "Can y'all loosen these cuffs, man?  Like, I ain't break no laws, man" (18:06:40).  Officer Riosbaas heard the complaint, but did not respond, nor check or adjust the handcuffs.  Laughing could be heard outside the police vehicle.  Officer Riosbaas left the vehicle and closed the door (18:06:52).

40.     At this point in the stop, Officer Riosbaas was simply waiting for his supervisor to arrive.  He had no plan to resolve Donahue's complaints himself.  His plan was to wait for his supervisor to arrive to make decisions.  So, he continued to prioritize working on paperwork meanwhile rather than address Donahue's handcuffs.

### E.     DONAHUE'S COMPLAINT TO SUPERVISING OFFICER EVANS.

41.     Just around then, at about 6:07 p.m., Supervising Officer Evans did arrive at the scene.  That night, he was an on-duty employee of the Antioch Police Department of the City of Antioch.  And, throughout the events that follow, he was courteous and professional in what he said to Donahue.

United States District Court
Northern District of California

42.    He spoke with Officer Riosbaas about the situation.  Officer Riosbaas did not tell Supervising Officer Evans that Donahue had complained about his handcuffs, nor otherwise ask the supervisor to check the handcuffs.

43.    Meanwhile, about a minute after Officer Riosbaas had left the vehicle, Donahue said to himself, "I reserve all my rights."  He continued to sit in silence, with nothing visible or audible outside the vehicle to reveal why he was still being held.  About forty-five seconds after that, he said, "Know you 'posed to let me go."  Still nothing was visible or audible to reveal why he was being held.  "Detained me too, that's a lawsuit."

44.    At about 6:09 p.m., Supervising Officer Evans opened the passenger door to the rear seat where Donahue was seated.  The two spoke:

> EVANS:  Hey, man, how are you?
>
> DONAHUE:  Fine -- how are you?
>
> EVANS:  What's going on?
>
> DONAHUE:  Basically he pulled me over.
>
> EVANS:  Okay.
>
> DONAHUE:  I tried to give him my passport to show who I am. And he wanted me to roll all my windows down, but first he told me to turn my car off.  I can't roll all my windows down, that's one thing.  Then on top of that, I'm not under his jurisdiction, your jurisdiction, or the jurisdiction of the Fourteenth Amendment, sir.
>
> EVANS:  Okay.  What jurisdiction are you under?
>
> DONAHUE:  I'm not under any of those jurisdictions.  I gave him my -- I gave him my passport card to run that and then it should be done -- over with right there.
>
> EVANS [starting to close the door to the police vehicle]:  Okay. Well, just bear with us, all right, sir?  Watch your knee.
>
> DONAHUE:  Can you loosen up these cuffs, though?
>
> EVANS [holding the door]:  Well, I'll have them take a look in just a sec, alright?
>
> [Supervising Officer Evans finished closing the door.  Donahue said the following to himself:]
>
> DONAHUE:  Come on, man.

United States District Court
Northern District of California

1    (18:09:26–18:10:10).  This was about fifteen minutes into his handcuffing (and the only

2    complaint about handcuffing made to the supervising officer, and the third to any officer).

3        45.    Although Supervising Officer Evans heard the complaint and told Donahue that

4    he would "have them take a look," Evans had not observed any signs of physical discomfort or

5    distress from Donahue.  And, he had heard hundreds of complaints across his career and none

6    had led to an injury he knew about.  His own experiences being handcuffed in training had led

7    him to believe that handcuffs were inherently uncomfortable.  So, he thought Donahue was just

8    complaining.  Supervising Officer Evans paid no further attention to the issue.  He did not tell

9    Officer Riosbaas nor anyone else to check the handcuffs.

10       46.    About thirty seconds after Supervising Officer Evans had closed the door, Officer

11   Riosbaas opened the driver's door and entered the police vehicle.  He asked if Donahue would

12   sign a citation and if anyone could come pick up Donahue's car.  Donahue at first said he

13   would not consent to any contract, then later said he would sign the citation.  Their

14   conversation went as follows:

15           DONAHUE:  I reserve all my rights.  [Extended pause.]  I'm an
             American National.
16

17           RIOSBAAS:  So you're going to be cited.  Are you gonna -- are
             you willing to sign your citation?

18           DONAHUE:  No, because I'm not -- I don't, I don't, that's not --
19           I'm not under that jurisdiction.  I don't have to do that.

20           RIOSBAAS:  So, if I present you with a citation, are you saying
             you are not going to sign it?

21           DONAHUE:  I'm not under the jurisdiction.

22           RIOSBAAS:  I hear what you're saying.  I'm just trying -- this is
             something I have to ask you.  So I'm asking, if I present you with a
23           citation --

24           DONAHUE [talking over]:  I reserve all my rights.

25           RIOASBAAS:  -- are you going to sign it?

26           DONAHUE [repeating].  I reserve all my rights.  I don't consent to
             signatures or contracts.
27

28           RIOSBAAS:  Okay.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    DONAHUE:  UCC 1-308 -- What violation?  There is no
2    violations.

3    (18:10:46–18:12:11).  The two stopped talking for about thirty seconds.  Both stayed in the

4    vehicle.

5        47.    About thirty seconds later, the conversation resumed — with Officer Riosbaas

6    still suggesting Donahue might be released, and now inquiring into whether a licensed driver

7    would be able to drive Donahue's vehicle away:

8    RIOSBAAS:  Do you have anyone that could pick up your
9    vehicle?

10   DONAHUE:  Why do they need to pick my vehicle up?

11   RIOSBAAS:  You have a[n] expired driver's license.  So you'll
     not be permitted to drive your vehicle from this location.

12   DONAHUE:  You didn't even run my card.

13   RIOSBAAS:  We did.

14   DONAHUE:  No you didn't.

15   RIOSBAAS:  I assure you we did, sir.  [Ten seconds passed.]  This
16   is where the ticket is going to be addressed to unless you give me
     another address:  2420 Sand Creek Road, C1 Box 231.  Is that
17   going to get to you?  Is that a good address for you, sir?

18   DONAHUE:  Y'all letting me go, right?

19   RIOSBAAS:  Is this a good address for you, sir?

20   DONAHUE:  I'm asking a question.

21   RIOSBAAS:  It depends if you sign your citation or not.

22   DONAHUE:  You going to violate my rights?  *Yep, I'm going to
     sign it.  Yep.*  [Emphasis added.]

23   RIOSBAAS:  *Great.  Do you have someone who can give you a
24   ride?*  [Emphasis added.]

25   DONAHUE:  Yep.  I need my phone.

26   RIOSBAAS:  Okay -- who would that person be?

27   DONAHUE:  I'll call them.  I'll call 'em so they can come pick
     my car up.  They can drive me.

28   RIOSBAAS:  Are you willing to tell me who that person's going to

11

United States District Court
Northern District of California

be?

DONAHUE:  No -- why do I have to tell you who it is?

RIOSBAAS:  I'm just asking, sir, so I can --

DONAHUE:  If I call 'em right now, they'll have the proper identification and everything that they need to drive that car.

RIOSBAAS:  Okay.  They're going to have a valid driver's license?

DONAHUE:  Yeah.  I have a valid passport.  Like you violating my rights, sir.  I have, I have the right to travel --

RIOSBAAS:  -- Just so you know, whoever comes will have to have a valid driver's license, okay?

DONAHUE:  -- I have the right to travel.  I need to use my phone.

(18:12:28–18:14:36).  At this point, Officer Riosbaas exited the police vehicle and shut the door.  Donahue remained quiet and alone inside.

48.    Outside the vehicle, Officer Riosbaas and Supervising Officer Evans then determined that Donahue would need to go to jail and that the car would need to be towed.  A call was placed for a "jailer" to come pick up Donahue.

### F.    DONAHUE'S THIRD COMPLAINT TO OFFICER RIOSBAAS.

49.    About thirty seconds later, at 6:15 p.m., Officer Riosbaas opened the front passenger door and reentered the police vehicle.  Donahue resumed the conversation about the citation, which Officer Riosbaas answered despite the change in plan (he still sought insurance information related to the stop and newly planned tow).  And, for the very first time, about 20 minutes into the handcuffing and after having decided to take Donahue to jail, Officer Riosbaas told Donahue a reason for having stopped him:

DONAHUE:  And what is the ticket for?  Because I for sure wasn't speeding, so what is this ticket for?

RIOSBAAS:  I'm sorry?

DONAHUE:  What is this ticket for?

RIOSBAAS:  This ticket's going to be for reckless driving.

DONAHUE:  Reckless driving?!

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

RIOSBAAS:  Yes.

DONAHUE:  How was I reckless driving?

RIOSBAAS:  At the speed that you were traveling on a 45-mile-per-hour lane.

DONAHUE:  No.  I wasn't reckless driving.  That's a lie.  I wasn't even speeding.

RIOSBAAS:  Sir, I have you on camera.

DONAHUE:  I wasn't speeding.  You was -- I seen you right behind me the whole time.  I seen when you got behind me, there was no speeding.  That's crazy.  For speeding.  Wow.

(18:15:30–18:16:24).  At 6:16 p.m., the two stopped talking for a moment.  Both remained in the police vehicle.

      50.    About thirty seconds later, Donahue restarted the conversation with Officer Riosbaas.  For the very first time, about 23 minutes after handcuffing, Officer Riosbaas asked for Donahue's insurance information, and for his wallet (he previously had taken Donahue's passport from Donahue's hand when handcuffing him):

DONAHUE:  I seen when you first got behind me -- there's no way you seen me speeding.  It don't even matter anyways because I ain't under your jurisdiction or the jurisdiction of the Fourteenth Amendment and you violating my rights.

RIOSBAAS:  Do you have any insurance on the vehicle?

DONAHUE:  Do you have a RAS?[1]  There's no evidence of a crime.  Traffic stops are not crimes.  [Pause.]  Do you have a RAS?  [Pause.]  And yes, my vehicle -- my automobile, not vehicle, my automobile is insured.

[30 seconds passed in silence.]

RIOSBAAS:  Where's your insurance?

DONAHUE:  I don't have to show you all that.

RIOSBAAS:  You have to have proof of insurance, sir.

DONAHUE:  I got insurance.

RIOSBAAS:  I'm just trying to figure out where that insurance is so I can verify.  I don't want to have to cite you for something if

---

[1]   Donahue used the acronym for "Reasonable Articulable Suspicion."

you have the --

DONAHUE:  -- You violated my rights already.  You already violated my rights.  I have insurance, though, for sure.  There's no need for me to lie about that.

RIOSBAAS:  Okay.  And I'm just asking where is that located?

DONAHUE:  I have it in my wallet.

RIOSBAAS:  *It's in your wallet?  Where's your wallet?* [Emphasis added.]

DONAHUE:  *In my pants.*  [Emphasis added.]

RIOSBAAS:  Okay.

DONAHUE:  But I would like to call my father to come because this is crazy.

[15 seconds passed in silence.]

DONAHUE:  I need your name, your badge, and everything.

RIOSBAAS:  You will get all of that.

DONAHUE:  Everybody's.  Everybody's.

RIOSBAAS:  How tall are you sir?

DONAHUE:  I'm six two.

RIOSBAAS:  And your weight?

DONAHUE:  Like 240.

(18:16:40–18:19:12).  Donahue moved his upper body forward, left, and right in the seat.

51.    Then, at about 6:19 p.m., or over 24 minutes into his handcuffing, Donahue complained about the handcuffs for the third time to Officer Riosbaas (the fourth time to any officer).  He said:

These cuffs are super tight.  They're cutting off circulation in my hands.  My hands are starting to get numb as hell.  [Pause]  I ain't committed no crime.  I shouldn't even be in handcuffs.

(18:19:19–18:19:32).  This was the first time Donahue had mentioned to an officer that he was having circulatory problems.

52.    Officer Riosbaas heard him but said nothing.  He did not check the handcuffs.  The officer now believed "the handcuffs [were] something that needed to be addressed," but

not "immediately."  "I was still taking care of paperwork" (Tr. 235).  The jailer "was on his way, and [Officer Riosbaas] knew [the jailer] was going to take care of the handcuffs" by replacing them with another set.  And because Officer Riosbaas "had more work to do" meanwhile, he went back to his paperwork rather than attend to the handcuffs (Tr. 233, 236–37).

53.     After this exchange, in front of the police vehicle, five other officers and the training cadet — who all had been out of view for some time — progressively returned into view of the dash camera.  One opened the front-passenger door of Donahue's car and eventually inserted his head.  Another inserted his head into the already-open driver's door of Donahue's car.

    **G.**  ***DONAHUE'S FOURTH COMPLAINT TO OFFICER RIOSBAAS — AND OFFICER RIOSBAAS'S FIRST RESPONSE TO ANY SUCH COMPLAINT.***

54.     Donahue was not aware of the plan for the jailer to arrive and had heard no response as to his complaints about the handcuffs.  He was in pain.

55.     So, at about 6:20 p.m., or 25 minutes into his handcuffing, Donahue complained about the handcuffs for the fourth time to Officer Riosbaas (the fifth time to any officer).  He said:  "Can they loosen these up?  My hands are starting to lose circulation" (18:19:54).

56.     For the very first time, Officer Riosbaas responded verbally to a complaint about handcuffs.  He said, "I will get to that as soon as I can, okay?" (18:19:59).  Once again, while understanding that the handcuffs needed to be addressed, Officer Riosbaas still expected the jailer to address them when he arrived — but the jailer had not arrived.  Officer Riosbaas continued to prioritize his paperwork and did not check the handcuffs.

57.     Meanwhile, in front of the police vehicle, the search of Donahue's car continued.  However, the search was not exigent, was not time-intensive, and it did not necessitate every officer's involvement.  For instance, just as Officer Riosbaas responded to Donahue's complaint about lost circulation — by stating, "I will get to that as soon as I can, okay?" — an officer walked from Donahue's car back towards the police vehicle and towards Officer Riosbaas, then turned around and walked back towards Donahue's car, then stood there doing

nothing.  Another officer already stood looking over the shoulder of still another officer into the front-passenger door of Donahue's car.  Yet another officer soon returned to stand between the two vehicles on the sidewalk, looking at his phone.  And, the search itself concluded within two minutes and 36 seconds (*compare* 18:19:28 (opening front-passenger door), *with* 18:21:34 (shutting trunk), *and* 18:22:04 (shutting front-passenger door)).  Finally, not counting Officer Riosbaas, at least two officers present on the scene had no meaningful role in the search at all — and at least two more officers became idle once the search concluded at 6:22 p.m.

### H.    DONAHUE'S FIFTH COMPLAINT TO OFFICER RIOSBAAS — AND OFFICER RIOSBAAS'S SECOND RESPONSE TO ANY SUCH COMPLAINT.

58.    At 6:36 p.m., or 41 minutes into his handcuffing, Donahue complained about the handcuffs for fifth time to Officer Riosbaas (the sixth time to any officer).  Donahue said, "Can y'all loosen these cuffs?"  Officer Riosbaas responded:  "We're going to take care of that right now" (18:36:01).

59.    By then, the jailer had arrived (Tr. 233).  The jailer was Community Service Officer Rudy Nieves.  (Officer Nieves was previously dismissed as a defendant in this case.)

### I.    DONAHUE'S HANDCUFFS REPLACED.

60.    Still at 6:36 p.m., Officer Nieves led the still-handcuffed Donahue out from Officer Riosbaas's police vehicle and around to the police vehicle's hood.  He patted down Donahue.

61.    Then, Officer Nieves applied a double set of his own handcuffs on top of the single set of handcuffs on Donahue.  As Officer Riosbaas later testified, using a double set would allow Donahue's arms to rest closer to shoulder-width apart even as his hands remained behind his back (Tr. 238–39).  In the moment of application, however, both sets were applied at once and Donahue's arms were pulled upwards to enable Officer Nieves to work on his wrists — and Donahue grimaced and groaned in pain.  This was the first audible evidence of discomfort heard by the officers apart from what Donahue had said to them.

62.    Then, Officer Nieves removed the first set of handcuffs to return them to Officer Riosbaas (Tr. 134–36, 238–39).  Removing them revealed deep creases on Donahue's *left* wrist

16

1    in the location of the first set of handcuffs, as seen in the video (*compare* 18:38:11, *with*

2    18:39:01).[2]

3        63.    Thus, at about 6:39 p.m., or 44 minutes into his handcuffing, Donahue's original

4    handcuffs were finally loosened and indeed removed — replaced with the extended double set

5    of handcuffs.

6        64.    Officer Nieves took Donahue to the jail where Donahue was processed.  Donahue

7    complained to Officer Nieves about experiencing persistent pain.

8        65.    Donahue did not return to work for at least one week following the incident

9    because he was in jail.  Donahue is a barber.  Although Donahue suffered some ongoing pain

10   from his handcuffing, he did not suffer so much that he would have missed work had he not

11   been in jail, nor so much that he missed work after being released from jail.

12       66.    After leaving jail, Donahue visited a doctor and complained of continued pain

13   from handcuffing, especially in his *left* hand.  He received a brace from the doctor to wear on

14   his left hand (Tr. 181–83).

15       **3.**    **THE IPHONE'S DISAPPEARANCE.**

16       67.    We return to our timeline on January 6, 2023.  At 5:54 p.m., as Officer Marques

17   handcuffed Donahue, he took Donahue's iPhone and placed it in his vest (17:54:40).  (Recall

18   that Officer Marques testified at trial but was earlier dismissed as a defendant in the case.)

19       68.    At 5:55 p.m., as Officer Riosbaas led him to the police vehicle, Donahue asked

20   "Where's my phone at?"  Officer Marques, who had stepped away from handling Donahue,

21   removed the iPhone from his vest.  The screen showed the iPhone was still recording using the

22   iPhone's standard recording functionality familiar to any iPhone user (17:55:02).  (At no point

23   in the traffic encounter had Officer Marques heard Donahue narrating or communicating with

24   any third party using the iPhone, such as one might during a livestreaming using Instagram

---

[2]  Donahue also took a picture of a hand around when he was released from jail.  But that picture is of a right hand (Pl.'s TX 4).  It shows impressions on the back of the hand that could not have been made except by handcuffs loose enough that they slid off the wrist.  Thus, this order concludes that the marks shown in the photograph were not imprinted by the handcuffs at issue (*compare ibid.* (mark on a right hand), *with* 18:38:11, 18:39:01 (handcuff locations); *see also* Tr. 242 (related testimony)).

United States District Court
Northern District of California

1    Live.)  Officer Marques deliberately pressed the stop button on the iPhone's screen to stop its

2    recording, then a button on its side.  Donahue asked, "Why you shut off my phone, man?"

3    (17:55:07).[3]

4          69.    Then, Officer Marques deliberately placed the iPhone on the roof of Officer

5    Riosbaas's police vehicle (17:55:12 (in window's reflection); *see* Tr. 341–42).  He again was

6    not handling Donahue at this time.  To place the iPhone on the roof of the vehicle, he reached

7    above the vehicle's open front-passenger door, wherein he could have placed the iPhone

8    instead.  After doing so, he turned around as if to leave, saw the training cadet looking at him,

9    turned around to face the car again, closed the front-passenger door, and finally walked away

10   towards Donahue's car.

11         70.    The phone contained video and audio recorded from Donahue's vantagepoint of

12   the initial minutes of the roadside traffic stop and of his arrest with firearms drawn.  Officer

13   Marques had placed the iPhone on the roof of the police vehicle where, as it turned out, it

14   would not be recovered as evidence.

15         71.    Donahue's iPhone cost $1,400.

16         72.    There is no trial evidence about any other possessions being taken from any other

17   arrestees, nor of any City policy or practice related to taking possessions and, for instance,

18   putting them on the roofs of cars.  This omission is fatal to the *Monell* claim.

19                          **CONCLUSIONS OF LAW**

20   **1.    THE IPHONE'S DISAPPEARANCE.**

21         Donahue asserted that the City violated his Fourth and Fourteenth Amendment rights

22   when he was deprived permanently of his iPhone.

23         At trial, however, Donahue did not prove that there was a departmental policy, practice,

24   or policy of inaction for which a permanent dispossession of an arrestee's phone was at least a

25   highly predictable consequence.  *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694–95

26   (1978); *Connick v. Thompson*, 563 U.S. 51, 63–64 (2011); *Jackson v. Barne*s, 749 F.3d 755,

27   ─────────────────

28   [3]  This order does not credit Officer Marques's testimony that he believed he was shutting off a
     live broadcast and did so to ensure other people did not arrive at the scene (Tr. 348–49).

1    762–63 (9th Cir. 2014).  As a result, Donahue did not prove that the City violated his

2    constitutional rights in connection with the permanent loss of his iPhone.

3        **2.    THE HANDCUFFING.**

4        Donahue also asserted that Supervising Officer Evans and Officer Riosbaas used

5    excessive force by keeping him in overtight handcuffs for over 40 minutes while ignoring his

6    complaints.  This order first analyzes whether Officer Riosbaas violated Donahue's

7    constitutional rights, then whether any such violation was clearly established.  It then analyzes

8    whether Supervising Officer Evans violated Donahue's constitutional rights.  *Pearson v.*

9    *Callahan*, 555 U.S. 223, 231–32, 236 (2009).[4]

10        **A.    OFFICER RIOSBAAS.**

11            **(i)    The Fourth Amendment Violation.**

12        Based on a review of pertinent caselaw regarding handcuffs, this order holds that when a

13    detainee tells the officer that the handcuffs are too tight and are cutting off circulation and

14    when the handcuffs have been on long enough and the circumstances suggest that the

15    complaint may be plausible, the officer has a duty under the Fourth Amendment to promptly

16    check the handcuffs for excessive tightness and to make any adjustment needed unless some

17    other exigency has greater priority.  *See LaLonde v. Cnty. of Riverside*, 204 F.3d 947, 952–53,

18    959–960 & n.17 (9th Cir. 2000) (ignoring complaints of circulatory loss from tight handcuffing

19    for no reason violates the Fourth Amendment, on record as viewed for detainee); *Meredith v.*

20    *Erath*, 342 F.3d 1057, 1063–64 (9th Cir. 2003) (ignoring complaints of pain from tight

21    handcuffing); *Palmer v. Sanderson*, 9 F.3d 1433, 1436 (9th Cir. 1993) (failing "to justify [a]

22    refusal to loosen [ ] handcuffs after [detainee] complain[s] of [ ] pain"); *Black Lives Matter Los*

23    *Angeles v. City of Los Angeles*, 113 F.4th 1249, 1261 (9th Cir. 2024) (summarizing).

24

25

26

27    ───────────────────────────────
      [4]    Qualified immunity is a question of law for the judge that turns on underlying facts ordinarily
28    found by a jury.  *Morales v. Fry*, 873 F.3d 817, 821–24 (9th Cir. 2017).  Here, the underlying facts
      were also found by the judge because both sides waived the right to a jury trial.

*United States District Court*
*Northern District of California*

1

2

***(a)***     ***Donahue's Handcuffs Were Overtight and***
***the Reasonable Officer Was On Notice to***
***Check Them.***

3    A claim for excessive force first requires proving that there was in fact force applied

4    about which the reasonable officer would have been aware. *Palmer*, 9 F.3d at 1436 (applying

5    *Graham v. Connor*, 490 U.S. 386 (1989)). On our facts, Donahue's handcuffs were indeed

6    overtight. He complained to Officer Riosbaas several times about the tightness and twice told

7    Officer Riosbaas that the tightness was cutting off his blood circulation. Officer Riosbaas,

8    however, did not bother to check the handcuffs.

9    Opposing this result, Officer Riosbaas argues *first* that Donahue did not experience

10   physical injury, *second* that he did not experience pain, and *third* that even if he did experience

11   physical injury or pain it was reasonable for Officer Riosbaas to ignore his complaints either

12   because Donahue was not credible or else, *finally*, because Officer Riosbaas reasonably

13   believed that Supervising Officer Evans had addressed any issues. None is correct.

14   *First*, Donahue experienced a temporary physical injury in the form of impaired

15   circulation and deep creases to his wrists and hand (18:39:00). And, while Donahue did not

16   suffer ongoing physical injury, he did experience at least intermittent pain in his left wrist,

17   prompting him to seek relief by visiting a doctor. *See LaLonde*, 204 F.3d at 952–53 (pain and

18   circulation loss from handcuffing prompted detainee to later seek medical care, even though

19   this resulted in no prescription care).

20   *Second*, Donahue also experienced moderate pain beyond mere ordinary discomfort,

21   which itself constituted incremental force requiring justification. *E.g.*, *Palmer*, 9 F.3d at 1436

22   (even ignored complaints of pain suffice); *Meredith*, 342 F.3d at 1063–64 (same). We now

23   know that within five minutes of his handcuffing, Donahue complained twice to himself that

24   the "motherfucking cuffs on me" were "hella tight" (17:59:21; 17:59:58). He had no reason to

25   tell himself anything but the truth.

26   This pain from handcuffing is furthermore inferred not only from his complaints but from

27   Donahue's physical response to handcuffing. Donahue is a big, broad man, but with short

28   arms. Donahue told Officer Riosbaas at the scene that he was six feet, two inches tall, and

20

weighed 240 pounds — and he looked it.  Nonetheless, he was handcuffed by two officers using a single set of handcuffs behind his back.  Each shoulder visibly strained backward so each arm could reach its opposite, with the handcuffs barely bridging the gap and pulling tightly against the skin on each wrist and hand (*e.g.*, 17:55:01; 18:05:31; 18:18:11; 18:38:12). When Officer Nieves arrived and looked at the handcuffs 44 minutes after handcuffing, as Donahue stood up with hands visible, he made an adjustment that relieved the obvious stress. As Officer Riosbaas testified, "[Officer Nieves] actually g[ave] Mr. Donahue two handcuffs so it's less pressure on his shoulders, so he has more mobility behind his back.  And he took off my [single set of] handcuffs" (Tr. 238–39; *see* 18:39:13).  In other words, the mismatch between a broad body and a short, single set of handcuffs itself imposed an increment of force about which a reasonable officer would have been aware and done something to avoid in the first place or to correct as soon as possible, absent competing demands.  *E.g.*, *Sialoi v. City of San Diego*, No. 11-cv-2280-W (KSC), 2013 WL 6410987, at *9 (S.D. Cal. Dec. 9, 2013) (Judge Thomas Whelan) (injury resulted from use of one set), *aff'd on other grounds* (*no basis to detain*), 823 F.3d 1223, 1229, 1234–36 (9th Cir. 2016); *Bernal v. Sacramento Cnty. Sheriff's Dep't*, 73 F.4th 678, 685, 693 (9th Cir. 2023) (use of one or two sets is relevant in excessive force analysis).

*Third*, although a reasonable officer on the scene could have doubted Donahue's verbal complaints as not credible up to a point, such excuse expired once Donahue twice complained to Officer Riosbaas that he suffered circulation loss — which occurred 24 and 25 minutes into handcuffing.  Yes, Donahue was irritating and incredible on many topics.  He did himself no favors by, for instance, telling Officer Riosbaas that "I ain't under your jurisdiction or the jurisdiction of the Fourteenth Amendment and you violating my rights" (18:16:54).  But Donahue's specific complaints of handcuffing mounted and became more severe.  He went on to make one complaint to Supervising Officer Evans (in the under one minute they were together) and five to Officer Riosbaas (in the up to thirty minutes they were together).  The ones raising circulatory issues were two of the final three complaints to Officer Riosbaas:

- At 6:19:19 p.m., Donahue stated: "These cuffs are super tight. They're cutting off circulation in my hands. My hands are starting to get numb as hell." Officer Riosbaas ignored the complaint.

- At 6:19:54 p.m., Donahue renewed his complaint: "Can they loosen these up? My hands are starting to lose circulation." Officer Riosbaas acknowledged the complaint verbally — but did nothing.

No reasonable officer could have mistaken or dismissed those two complaints even if Donahue was a liar as the officer suspected. The officer should have at least checked the handcuffs. And, if he had done so, he would have seen they were too tight.

*Finally*, Officer Riosbaas argues that he reasonably believed that any handcuffing issues had been evaluated or resolved by Supervising Officer Evans. This argument is disingenuous. There is no evidence in our trial record that the two officers ever spoke about Donahue's handcuffing complaints. And, ten minutes after Donahue spoke directly with Supervising Officer Evans, Donahue twice complained to Officer Riosbaas that he was experiencing impaired circulation, as just recounted.

### (b)    There Was No Governmental Interest Justifying the Failure to Relieve Force.

A claim for excessive force next requires proving that there was no countervailing government interest justifying the force applied or not relieved. *Palmer*, 9 F.3d at 1436; *Graham*, 490 U.S. at 394–97. Here, Officer Riosbaas lacked any countervailing government interest but "paperwork." There is zero evidence — Z-E-R-O — as to any other interest.

*First*, Officer Riosbaas does not even argue that the severity of the crime, the threat to officers or public, or the risk of flight precluded checking Donahue's cuffs.[5] *Cf. Graham*, 490 U.S. at 396 (cognizable interests). Indeed, the officers ultimately did check and replace Donahue's handcuffs. Moreover, our court of appeals has rejected that a stopped driver's scoffing at requirements to be licensed, registered, and insured — along with verbally insulting

---

[5]  Indeed, although Donahue did not challenge that he was placed in handcuffs in the back of the police vehicle, no evidence was offered to explain why removing his handcuffs was not an option, nor why removing him to the curb where he could sit handcuffed but in a new position was not one, either.

the officers — could without more justify an increment of force. *Winterrowd v. Nelson*, 480 F.3d 1181, 1185–86 (9th Cir. 2007).

*Second*, Officer Riosbaas argues he was justified in not checking the handcuffs sooner because he needed to "g[e]t back to the paperwork" (Tr. 231). But Officer Riosbaas offers no judicial decision holding that paperwork is a cognizable government interest under *Graham* — much less one able to overtake addressing complaints of pain from tight handcuffing. Recall that when Donahue first complained about loss of circulation, Officer Riosbaas did not even respond verbally — and nothing else was then happening on the scene except paperwork. When Donahue renewed his complaint of lost circulation (about 30 seconds later), Officer Riosbaas responded, "I'll get to that as soon as I can" (18:19:54). The search of the car was then ongoing, but it did not embroil all officers (and it ended within three minutes). Officer Riosbaas testified that his priority remained "paperwork" — including new paperwork generated by the search. But this only underscores that Officer Riosbaas faced no exigent government interest of the kind *Graham* contemplates.

*Third*, Officer Riosbaas argues he was justified in giving paperwork priority because he at least had "a plan": He expected someone else to address the handcuffs eventually. But even this "plan" was premised on paperwork being more important meanwhile. That premise was wrong. Regardless, the "plan" to wait for another officer to arrive to address the handcuffs was especially dubious given there were already at least seven officers plus one training cadet on the scene. Officer Riosbaas did not argue at trial that none of these officers was capable of addressing the handcuffs or performing his paperwork while he did so. Indeed, within one minute of Donahue's request, one of the officers on the scene stood idle on the sidewalk, took out his cell phone, and looked at it for an entire minute (18:20:30–18:21:30). Officer Riosbaas could have but failed to ask another officer on the scene to check the handcuffs.

*      *      *

Balancing the force against the need, "[w]here there is no need for force, *any* force used is constitutionally unreasonable." *Fontana v. Haskin*, 262 F.3d 871, 880 (9th Cir. 2001) (quotation omitted). Here, even after twice hearing Donahue complain of circulatory cutoff,

23

the only governmental interests Officer Riosbaas proffered as being more important than addressing tight handcuffing was convenience to complete paperwork.  That reason was not good enough.  When a detainee or arrestee states that the handcuffs are super tight and so tight they are cutting off circulation and his hands are starting to get numb, or similar, and the complaint could be plausible in the circumstance, the officer has a duty under the Fourth Amendment to promptly check to see whether they are too tight and if so to make an adjustment or to require another officer to do so unless the officer has more exigent responsibilities.  Officer Riosbaas violated Donahue's Fourth Amendment rights.

### (ii)    This Violation Was Clearly Established.

This violation was already clearly established at the time of the conduct.  Indeed, by 2000, it already had been clearly established that to hear a detainee complain that "[t]hese handcuffs are too tight[;] [t]hey're cutting off my circulation" and yet not check his handcuffs despite having no competing exigent interests violated the detainee's Fourth Amendment rights.  *LaLonde*, 204 F.3d at 952–53, 960.  In *LaLonde*, a detainee made the just-stated complaint during an up to 30 minute on-scene handcuffing; the officers failed to check his handcuffs within that time and before leaving the scene, even though they had no competing exigencies.  The detainee later sought medical care for reported injuries from the handcuffs but received no prescription care.  (The detainee also had been pepper sprayed — a use of force our appellate court analyzed separately.)  On those facts, the officers had violated the detainee's Fourth Amendment rights.  *Ibid.*; *id.* at 954 n.10, 959 n.17 (holding this "force was [plainly] excessive").  Here, on our facts, Donahue complained not once but twice that the handcuffs were cutting off circulation — first that the cuffs were "super tight[;] [t]hey're cutting off circulation," then that he was "starting to lose circulation."  When Donahue made these complaints, he already had been handcuffed for long enough that the loss-of-circulation complaint was at least plausible, all the more so given Donahue's torso and physique.  Any reasonable officer would have known he was duty-bound to at least check to see if the handcuffs were indeed too tight unless other exigencies prevented it.  Officer Riosbaas had nothing else to do but paperwork.

1    Opposing this result, Officer Riosbaas argues that the caselaw establishes a 20-minute

2    grace period before the officer must check the handcuffs after a complaint of pain.  This order

3    rejects any such notion and holds that no such grace period has ever been established under the

4    law.  And, such a notion is topsy-turvy anyway.  An officer who is on notice of the issue and

5    has time to check the handcuffs should do so then and there.  In 20 minutes, an exigency might

6    really arise and time would not allow checking.

7    Officer Riosbaas next argues that he would have been on notice that he was violating

8    Donahue's rights had the handcuffing resulted in physical injury — but he simply did not

9    realize that ignoring pain could be enough.  *As an initial point*, Donahue complained not

10   merely of pain, but of a physical impairment — loss of circulation and numbness.  Donahue

11   also experienced a temporary physical impact, namely deep creasing on his left wrist.  Even on

12   Officer Riosbaas's articulation of what facts should have sufficed to put reasonable officers on

13   notice, such facts were present here.  *More fundamentally*, the standard Officer Riosbaas

14   supposes is not the standard that was clearly established before our traffic stop in January

15   2023.  As explained above, since 2000, any reasonable officer would have understood that

16   complaints of circulatory impairment or even of pain — when repeated by a handcuffed

17   detainee, and where there is no other exigency — suffice to create notice of incremental force

18   that requires an officer to check and adjust the handcuffs to avoid violating rights.  *See, e.g.*,

19   *LaLonde*, 204 F.3d at 952, 960; *Meredith*, 342 F.3d at 1063–64; *Palmer*, 9 F.3d at 1436.

20   Officer Riosbaas is not entitled to qualified immunity.

21   ### B.    SUPERVISING OFFICER EVANS.

22   Supervising Officer Evans, however, did not violate Donahue's constitutional rights.

23   When he arrived on the scene about ten minutes into Donahue's handcuffing, he was not told

24   that Donahue had complained about handcuffing.  (He did know, however, based on dispatch

25   traffic, that Donahue had not been handcuffed long.)  He then spoke with Donahue for 44

26   seconds, during which Donahue raised one complaint about his handcuffs but without

27   expressly mentioning pain or circulatory problems.  Supervising Officer Evans did not observe

28   discomfort.

A single complaint about handcuffs and without any other verbal or nonverbal indication of discomfort or circulatory problems was not enough to put a reasonable officer on notice of incremental force requiring an incremental justification for that force or, failing that, action to check the handcuffs to relieve discomfort. This would be a closer case had Supervising Officer Evans heard (or heard about) a more severe complaint or multiple ones, or had heard such complaint(s) later in a longer detention he alone conducted — not early in a detention he was not directly conducting. *Cf. Meredith*, 342 F.3d at 1060 ("complained several times" over 30 minutes).

Thus, there was no constitutional violation by Supervising Officer Evans.

### 3.    DAMAGES.

This order finds only one constitutional violation: Officer Riosbaas violated Donahue's Fourth Amendment right to be free from excessive force when he ignored Donahue's twice-repeated complaints of impaired circulation. No economic damages flowed from that violation: Donahue did not prove medical expenses, lost wages, nor anything else. However, pain and suffering did result: Donahue sat in pain, his wrists pinched, and his hands becoming progressively number. This order finds that for each minute between his first complaint of impaired circulation and the eventual removal of the handcuffs, Donahue experienced pain and suffering compensable at the rate of $1,000 per minute. Because this period lasted 19 minutes and 42 seconds, or 19.7 minutes, Donahue is entitled to $19,700.00.

No punitive damages are warranted. Officer Riosbaas performed beneath the expectation of a reasonable officer in his position. But he was a new officer — having been a solo officer for just six weeks at the time. He did not swear, raise his voice, or act with anything but professionalism and courtesy to Donahue. He did not behave in a way deserving of punitive damages.

**CONCLUSION**

The City of Antioch did not violate Donahue's constitutional rights with respect to his iPhone.  Supervising Officer Evans did not violate a constitutional right with respect to overtight handcuffing.  But Officer Riosbaas did violate a clearly established constitutional right by failing to investigate Donahue's repeated complaints that his handcuffs were causing circulatory loss.  For pain and suffering, $19,700.00 is awarded.  No punitive damages are awarded.

Judgment will be entered accordingly.  Both sides should be mindful of the requirements and timeline for filing any appeal to the court of appeals.

**IT IS SO ORDERED.**

Dated:  July 24, 2025.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE

United States District Court
Northern District of California